IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

**FILED**

2005 MAR -1  A 10: 44

|                              |     |                                    |
|------------------------------|-----|------------------------------------|
| UNITED STATES OF AMERICA     | )   | Crim. No. 3:02CR00055 (EBB) DISTRICT COURT |
|                              | )   |           NEW HAVEN, CT            |
| v.                           | )   |                                    |
|                              | )   |                                    |
| RAANAN LIEBERMANN            | )   | February 28, 2005                  |
|                              | )   |                                    |

## DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Defendant Raanan Liebermann respectfully submits this Memorandum to set forth factors for the Court to consider at sentencing, and in support of his request that the Court depart downward to a sentence that does not include a term of incarceration.

I.    **Factual Background**

A.    **Family and Personal History**

Raanan Liebermann and his wife Nechama come from families that emigrated to Israel; Dr. Liebermann's parents were early Jewish settlers in what became the state of Israel, while Nechama's family left Eastern Europe for Israel shortly after the Holocaust. Dr. Liebermann grew up during wartime. When he was five years old he found himself alone at home when the German air force raided his hometown of Haifa. He had the presence of mind, even at that age, to find his own way to the building's bomb shelter. As described in the PSR (¶ 47), Mr. Liebermann's early life shows he responded to the stresses of a wartime childhood by focusing on scientific pursuits.

Dr. Liebermann received his doctorate in astrophysics from the University of Oxford, and he wrote his dissertation on the dynamics causing celestial pulsars. Dr. Liebermann then went to Brazil as a professor of physics, and later he and his young family came to New Haven in 1974 where he received a research grant from Yale University. While in New Haven, Nechema

1

Liebermann was diagnosed with a lesion that was feared to be melanoma. They decided to remain in New Haven, rather than pursue a job opportunity Dr. Liebermann received at the Los Alamos National Laboratory in New Mexico or return to Brazil, because they were happy with Nechema's physicians and were concerned that a hot and sunny climate would exacerbate her medical condition.

This decision required Dr. Liebermann to reorient his career, with no specific objective or opportunity available. By default, Nechema's work came to provide the income the family relied upon, while Raanan pursued his scientific and (to a large extent) altruistic interests. Dislocated from both his native country and his original profession, Dr. Liebermann isolated himself in these pursuits.

Dr. Liebermann undertook various projects in New Haven throughout the 1970's and 1980's. He founded a not-for-profit organization called the Center for Educational Resources and Laboratory for Advanced Studies (CERLAS), and through this organization Dr. Liebermann created Project Support. Project Support, which was located in the St. Paul American Methodist Church, an African-American congregation on Dwight Street, brought together social workers, psychologists, professionals, and volunteers to provide free services for the unemployed, with the support of regional heath care providers, especially St. Raphael Hospital and Yale New Haven Hospital. (See **Tab A**.) Through CERLAS Dr. Liebermann also started Project HELP (Hispanic Employment and Learning Program) and a program to assist women in re-entering the workforce after caring for children at home.

In the late 1970's, New Haven's then-Assistant Chief of Police (later Chief of Police) William Farrell became interested in forming a stress unit in the New Haven Police Department to help police officers handle traumatic events and the everyday stresses of their jobs. Chief

Farrell contacted Dr. Liebermann on the advice of the Department's chaplain, Reverend Clyde Bowman, who came to know Dr. Liebermann's work because he was the pastor of the church (St. Paul American Methodist) that rented space to Project Support. Dr. Liebermann designed and helped Chief Farrell establish a stress unit by setting up a peer counseling system supported by outside professional counselors. Dr. Liebermann selected, organized and trained the peer counselors, and assisted in counseling on the unit, using psychological coursework and training he obtained while doing his post-doctoral work at Yale University.

Chief Farrell also sought out Dr. Liebermann's help when developing the Department's hostage negotiation unit. Dr. Liebermann helped analyze information provided by the hostage negotiators and recommended how a negotiation should be conducted and what action taken, subject to Chief Farrell's approval; there were several occasions on which Dr. Liebermann worked with the hostage negotiation unit in life-threatening situations, and lives were saved because negotiations in which he was involved in a leading role were concluded peacefully. (For example, Dr. Liebermann helped the hostage negotiation unit to successfully resolve a hostage-taking at the Fairview Convalescent Home in New Haven on June 1-2, 1981, where a gunman held hostage an entire floor of heart patients, or to peacefully resolve a crisis when a mentally ill patient named Charles Watson took six people hostage at the Connecticut Mental Health Center on May 19, 1982). (See **Tab B**.) Although Dr. Liebermann was widely recognized for his work within the New Haven Police Department, he did not seek publicity for his volunteer efforts.

It was at the Project Support clinic, however, that Dr. Liebermann experienced the event that focused his attention on problems faced by the hearing impaired. One day while managing the clinic he found himself frustrated at the inability of his staff to provide the same quality of counseling to a Deaf client, with whom they could communicate only by writing on paper, as

they did to the clinic's other clients. Project Support focused on helping its clients close the gaps separating them from the working world, and the communication difficulties faced by this Deaf client presented a challenge of another order of magnitude entirely.

Dr. Liebermann's first invention for the disabled was a stethoscope for hard-of-hearing physicians, which he created in the mid-1970's. He first conceived a telephone for the deaf in 1978, but computer technology was not yet sophisticated enough to make the invention practicable. He took up the idea again in the 1990's, successfully developing a prototype and filed a patent application for the device in 1996, and was awarded a patent in 1999. These and other inventions, which will be discussed briefly below, all derived from insights learned from the interaction with the client of Project Support and later from deaf employees he hired, all stemming from an understanding of the challenges faced by the Deaf in communicating with the hearing world.

**B.      The Communication Challenges Faced by the Deaf**

Americans with a hearing and speech disability generally fall into (or place themselves into) two general categories: the "Deaf," who regardless of the severity of their hearing loss choose to communicate a sign language (signing), such as American Sign Language (ASL) as their primary language; and the "hearing-impaired," who communicate with the hearing world and who may use some form of mechanical assistance (implants, hearing aids) or read lips.[1]

Signing is a separate language, with its own grammar, rules, and complexities. Significantly, the hearing world has found it hard to accept Signing as a genuine language because it is so unlike the languages of hearing people. It was not until 1960 that a linguistics scholar named William Stokoe suggested that Signing was a genuine language – until then it was

---

[1] Although disability advocates rarely agree on how best (or whether ) to label disabilities, this distinction between "Deaf" and "hearing-impaired" is the most widely accepted among the Deaf community.

widely assumed that "real" languages must be verbal, and Signing was simply a sophisticated collection of gestures meant to replicate or replace English. Signing, however, uses grammatical building blocks that are visual and spatial, rather than auditory: handshapes, hand movement relative to body position, eye and eyebrow movement, mouth and nose movement, body posture – all play a role in the grammatical complexities of Signing. The syllables of voiced languages are compressed into movements, fingerings, and facial gestures, often occurring simultaneously. Grammar, emphasis and emotion are compressed into interwoven symbols, which all convey meaning. As the physician Oliver Sacks has described, "The body and soul of the signer, his unique human identity, are continually expressed in the act of signing."

Signing, then, most certainly is not simply the spelling out of English using fingered letters, as many non-Deaf assume, although Signing does incorporate fingerspelling to translate certain English words, such as proper names. Instead, Signing is a complete language that uses visual symbols, not distinct sounds (phonemes). Deaf who learn Signing as a first language therefore must learn both the connection of the phenome to the English letter or letters, and the meaning given in English to a collection of sound-letters (a word). There is no relationship in English between the shape of a letter and the shape of the sound it represents, so there are no clues that permit a Deaf child to look at a row of letters on a page and guess which ones represent which sounds – nor does written English represent all the meaningful differences between sounds.

Hearing children learn English by using hearing and speech to form phonetic units, and then learning to assign phenomes to those units. Since the Deaf process language visually, not phonetically, they cannot learn English this way but must instead memorize the meaning of each word. Learning English for a native Signing user thus is very similar to a native English speaker

learning written Chinese.  In both cases the learner must translate between two languages using two complete constructs (phenomes, in the case of English, and Chinese characters, which impart symbolic information).   Research widely recognizes that the Deaf are very slow readers: studies have shown that most Deaf graduate from high school with at best a third or fourth grade reading level.  (See **Tab C**.)

Any communications system that requires the use of written English therefore is by definition extremely limiting to the Deaf.  Until recently, the Text Telephone (known as the "TTY" machine) has been the best and only method for the Deaf to communicate electronically. A TTY machine essentially consists of a cradle for a telephone, a one-line LCD display approximately three to four inches long, and a compressed typewriter board.  Typed words are read on the LCD and sent over the telephone line; typed communications are received as text running across the LCD display, much as a stock ticker displays stock market results.

Unless a Deaf user is calling another person who has a TTY machine, the Deaf user uses the TTY to contact a call center, to request an operator (known as a "Calling Assistant" or CA) to complete a telephone call.  The CA then uses a standard telephone to contact a hearing person. The Deaf person uses his or her TTY machine to transmit text communications to the CA, and the CA receives those text communications on his or her computerized workstation and then reads the text into a telephone headset for the hearing person to hear.  In order to respond, the hearing person speaks over the telephone to the CA, and the CA then types that response back to the Deaf user to be read on his or her TTY machine.

The TTY machine was first demonstrated in 1964, but it was not until the 1980's that low-cost, portable, lightweight TTYs became publicly available. There have been no significant technological developments in the TTY machine since its inception.  For example, most TTY

6

machines still permit the user to read only one line of text at a time; the Deaf user must read incoming transmissions, and compose outgoing transmissions, across 3 to 4 inch LCD screen that holds 20 to 30 characters. More fundamentally, the TTY requires the Deaf user to communicate in English rather than Signing.

The recent ubiquity of the Internet offers the Deaf only a limited improvement. True, e-mail and text messaging are easier to read on a computer than a communication over a TTY machine, and Internet communications are passed back and forth more quickly (and with less chance for error) than when a CA is translating. Internet e-mail or instant messaging do not, however, work with the ease and speed of telephone communications. In addition, typed communications over the Internet do not remove the essential challenge faced by the Deaf: communicating through typed text in a phonetic-based (rather than symbolic-based) language that is not their own.

The approximately 500,000 Deaf in the United States suffer from an estimated 70 percent unemployment, and many of the remainder are under-employed. Most live on Social Security Disability benefits, and they cannot afford to purchase costly technology. Unfortunately, therefore, there is little market pressure (let alone economic incentives) to encourage technological improvements to the TTY machine, or more generally driving technological developments for the Deaf and hearing- and speech-impaired. The federal government has reacted to this market failure by attempting to mandate equality by statute, with mixed results.

**C.    Regulatory Structure**

Through the Americans with Disabilities Act (ADA), which was passed in 1990, Congress directed that public services provided for the disabled be as equal as possible to the services provided to non-disabled persons. The ADA thus mandated that, to the extent possible,

the federal government support the development and provision of communications technologies to enable the hearing impaired to communicate over the telephone in a "functionally equivalent" manner to hearing people.

As a practical matter, this mandate fell upon the services overseen and funded by the Federal Communications Commission ("FCC"), chiefly through the provision of Telecommunications Relay Services ("TRS"). TRS enables an individual who has a hearing or speech disability to engage in communication by telephone with a non-disabled person. The traditional method of providing TRS is for a TRS provider (e.g., AT&T, Sprint, MCI) to set up a call center and employ relay operators or calling assistants (CA). As discussed above, the CA is responsible for transliterating or "interpreting" conversations between two end users of TRS.

The FCC tried to meet its mandate under the ADA by subsidizing interstate TRS through an Interstate Cost Recovery Plan (also known as the TRS Fund). The National Exchange Carrier Association, Inc. ("NECA"), a not-for-profit organization, administers the TRS Fund for the FCC, and reimburses TRS providers based on monthly interstate TRS minutes of use – the time spent by CAs providing TRS on telephone calls. The amount per minute is calculated based on the average industry costs of providing the service.

The FCC imposes no costs or limits of any kind on any caller's use of TRS services. A caller may call a TRS service provider and use TRS transliteration services, free of charge, for any length of call and with any frequency. The caller is only responsible for any long distance charges associated with the leg of the call between the TRS call center and the hearing person. In order to ensure that the transliteration services offered by TRS providers are high quality, and as "functionally equivalent" as possible to the telephone calls experienced by hearing

8

individuals, the FCC sets certain performance standards (e.g., words-per-minute typing speed that all CAs must meet, 24-hour service, etc.)

Beginning in September of 2000, however, the FCC made efforts to enable the Deaf to communicate telephonically using Sign language. These efforts show that the FCC recognizes that TRS calls are inherently limited for the Deaf: that a telephone call using a TTY telephone cannot be "functionally equivalent" to the telephone service enjoyed by hearing individuals, no matter how proficient the CA. In 2002, the FCC began a pilot program in Texas (the "Texas Video Relay Service") that enables the Deaf to place a telephone call through a call center using a video phone, to communicate using Sign language over the video phone, and to obtain translation services (between Signing and spoken English). (See **Tab D**.) This pilot program requires participating TRS providers to employ Signing translators, who function exactly as CAs do in a TRS center that transliterates TTY communications – except this program enables the Deaf to communicate using Signing.

The Texas Video Relay Service, while substantially superior to traditional TRS services using TTY machines, is tremendously expensive, because a TRS provider must hire Signing translators rather than proficient typists as CAs. The Texas Video Relay Service currently reimburses TRS providers $7.60 per minute ($456/hour) for Sign-proficient CAs (as compared to $1.18 to $1.32 per minute for CAs transliterating calls using TTY machines). At various times over the last four years, the high cost of Signing translation services drove the reimbursement rate as high as $17.00 per minute ($1,020/hour). These high costs caused NECA to run out of funds during a period when signing interpreters were used.

The FCC also has sought to require TRS providers to provide "functionally equivalent" service in another respect: conference calling. FCC regulations state that three-way calling

9

functionality is a mandatory minimum standard – but TRS providers claimed that it was technologically infeasible for a TRS facility to originate or set up a three-way call.  The FCC initially granted a one year waiver of the requirement to February 24, 2005, after receiving petitions from the industry claiming that the technology was infeasible.  On February 18, 2005, the FCC "clarified" this regulation by issuing an Order requiring TRS providers to handle three-way calls if such calls are initiated by a caller or set up by the provider.  (See **Tab E**.)  Therefore, the burden now is on callers (not TRS providers) to arrange three-way calls, and if they are able to do so, such calls must be handled by their TRS provider.  TRS providers are not now required to originate or initiate three-way service – yet even though the other TRS providers claimed <u>in 2004</u> that TRS conference calling was impossible, Dr. Liebermann's corporation, Publix Network Corporation, had been providing such services since January 1999.

### D.    Publix Network Corporation and Signtel

These recent decisions by the FCC demonstrate that "functionally equivalent" telecommunication requires (1) providing a translation service that enables the Deaf to communicate using Signing, and (2) providing a TRS service that enables the Deaf to participate in conference calls.  These decisions, however, occurred <u>after</u> Dr. Liebermann set up Publix Network Corporation as a TRS provider, and after he had developed technologies to provide these services.

### 1.    Technological Innovations of Dr. Liebermann's Companies

Dr. Liebermann originally established Publix in 1997 not to provide TRS services, but to pursue various ideas for telecommunication technologies.  The company worked with Signtel Inc. to develop three principle technologies: (1) EDS-100, a method by which the poor could use payphones to receive voicemail; (2) telephone-based e-mail, which allows the poor to send and

receive e-mail over the telephone, without a need for a computer; and (3) Fast Cash

Transactions, by which a disposable checking account can be established over the telephone for

each new transaction, thereby enabling the poor who often do not posses bank accounts to obtain

the benefits of a checking account when needed, while also generally permitting more secure

electronic cash transactions.

The principle technologies Dr. Liebermann tried (and succeeded) to develop, however,

were methods to enable the Deaf to communicate using the telephone lines: functionally

equivalent conferencing using TTY units, the Signtel Phone, the Signtel Interpreter, and a true

Telephone for the Deaf.  The Signtel Phone enables two Deaf individuals to engage in a real-

time Signing conversation by ordinary, un-enhanced telephone lines, without the need for the

Internet or installing broadband or DSL.  The Signtel Interpreter uses voice recognition

technology to translate spoken English (or written English) into seamless video Signing,

displayed on a computer monitor.  The Signed communications are portrayed using a human

Signer.

If a Sign-hearing conversation could be said to involve two "legs," one from the hearing

person to the Signing user and the second from the Signing user to the hearing person, the

Signtel Interpreter solves the first "leg."  The Interpreter alone can be used to replace TRS

translation, since the Interpreter recognizes and translates a hearing caller's words into Signing

(the first leg), and the Deaf user can then type replies which are played for the hearing caller

using the device's synthetic speech (thereby rendering this second leg of the call similar to a

TTY call).

The Signtel Interpreter also contains technology useful to the Deaf for other purposes.

The device is portable in a laptop, enabling a Deaf user to carry a Signing translator to stores,

doctors' offices, etc. Further, it enables a Deaf person to read any typed material by seeing it in Sign language, including material downloaded from the Internet. In addition, the Interpreter overcomes many of the disparities between spoken language and Sign language. It enables the Deaf to distinguish between English words that have multiple meaning (such as "cool"), and also translates idioms that are not used in Signing, e.g., "raining cats and dogs" or "beat around the bush." The Signtel Interpreter enables the user to adjust the speed of Signing and it is therefore useful as a Signing teaching device. It also enables the user to use or remove words like "to," "am," and "of," resulting in an abbreviated form of English as used by the Deaf and thereby making it easier for the Deaf to understand via Signing, written or spoken language. The Signing translation technology in the Signtel Interpreter also forms the basis of an electronic book for the deaf (the eBook). The eBook enables the Deaf persons to read (in Sign language) any book with text converted into electronic media (either through scanning or by downloading from the Internet). Dr. Liebermann presented this product to Barnes & Noble in late 1999. It was well received and plans for market introduction were waiting for the completed beta testing of the eBook.

The Telephone for the Deaf is designed to translate Signing into spoken English, through algorithms developed by Dr. Liebermann for visual recognition with software that converts the hand and finger movements of the Signing user into synthetic speech capable of being heard by the hearing participant. The Telephone for the Deaf uses the technologies of the Signtel Phone and the Signtel Interpreter together with image recognition and artificial intelligence to enable a completely free and private two-way free conversation between a Deaf person and a hearing

person, without the need for a human interpreter, doing away with the need for calling assistants and the need for TRS service.[2]

### 2.    The Contributions of the Focus Groups

These and other technologies depended for their development on the use of focus groups of Deaf individuals employed by Dr. Liebermann in a sister company to Publix. Dr. Liebermann started using focus groups when designing prototypes of these technologies, beginning with a group of eight Deaf employees. Conceiving, developing, perfecting and marketing these technologies successfully required significant contributions from Deaf employees. And as with any data collection, the quality and quantity of the data improved results.

For example, to work effectively the Signtel Interpreter must accurately and quickly translate spoken English into Sign language. This presents two significant challenges. Spoken English is replete with slang, idioms, and regional variations, and there are many words for which there are multiple meanings, depending on context. Likewise, Signing is replete with slang and regional variation. Building the Interpreter involved making a computer-accessible video of each English letter, word and phrase, by a human Signer. Each individual video was then capable of being linked electronically. As described above on page 5, Signing involves lip, arm and hand movements, not just finger movements – presenting immense technical challenges to the development of a seamless video. Deaf users had to be able to view the Signed communication portrayed over the Interpreter as smooth and seamless gestures, not as jerky hand and finger movements. Most importantly, the translation had to be accurate – the sense of each

---

[2] The Telephone for the Deaf solves several additional shortcomings experienced by the FCC's Video Relay project. First, as noted above, Video Relay entails considerable ongoing expense through the payment of Sign interpreters, not a one-time technology purchase and thus the Telephone for the Deaf is vastly less expensive. Second, the Telephone for the Deaf does not require high speed video connections. Third, the Telephone for the Deaf is private – a fundamental difference between translation technologies and translation services.

idiom and phrase of spoken English had to be accurately captured and portrayed in Signing. The assistance of the Deaf employees enabled Signtel (a sister company to Publix) to develop a product that recognizes over 30,000 English words as well as 1,400 idioms and phrases. The deaf employees also were integral to making the Interpreter user-friendly and efficient (e.g., phrase saving, drag-and-drop features, etc.).

From the beginning, Dr. Liebermann intended that the research work would use the TRS system to enable hearing and Deaf employees to hold extended conference calls, in which the Deaf employees would participate, as focus groups, in product development. The conference calls Publix conducted were confined to normal business hours, and Dr. Liebermann did not permit employees to make personal TRS calls at any time except in cases of emergency. Thus, with extremely rare exceptions (that is, employee emergency calls), all TRS minutes billed by Publix involved the conference calls of the focus groups.

The focus groups each involved four deaf employees (Assistant Developers) and a hearing Calling Assistant (CA). Dr. Liebermann provided each call with "scripts" which presented to all focus groups, each day, new topics and questions for review and discussion. Dr. Liebermann and others then reviewed the transcripts of these calls (that is, the typed record of the TTY calls involving the Deaf employees) to develop and refine the assistive technologies.

The Deaf employees made very significant contributions, and most were very invested in their jobs. The Deaf employees contributed significantly not just to perfecting the Signtel Interpreter, but to the dozens of other product ideas. For example, a response from one of the deaf employees mentioned she went dancing the previous night. When Dr. Liebermann inquired how she could, as a Deaf person, dance without hearing the music, she answered that she followed the vibrations. This sparked the idea of enhancing assistive products for the Deaf by

using vibrations – and led to questions posed to the deaf focus groups about their use and experience of vibrations (from machinery, flooring, etc.) in their everyday lives to accomplish tasks or derive enjoyment. This, in turn, led to a completely new strategy in the development of technologies for the disabled community and especially those persons who are both deaf and blind. Dr. Liebermann developed a "Touch Language" based on vibrations, and his eCane navigation and communications tool likewise used vibrations to enable   deaf-blind persons to navigate to a restroom, an elevator or a cafeteria without the help of any third party.   In that venue, Dr. Liebermann also developed the eTV – A system whereby deafblind persons could benefit from TV airing in a functional equivalent way. (A complete list of the technologies Dr. Liebermann developed through the focus groups is attached at **Tab F**.)

3.     **The Unplanned Growth of Publix**

Dr. Liebermann did not originally intend to build and run a TRS center.  His original plan was to find partners to run TRS center, through which the focus groups' calls would be routed. He made business presentations to both Sprint and SBC/SNET, and he ultimately was turned down because the proposed new technology (the Signtel Interpreter and the Telephone for the Deaf) would ultimately reduce TRS minutes significantly (and thus would reduce the reimbursements received by call centers, including that of Dr. Liebermann's Publix Network). Dr. Liebermann also submitted business proposals to the Connecticut Development Authority and the Connecticut Department of Economic and Community Development outlining his use of TRS services to operate focus groups for product development.  These efforts likewise were unsuccessful.

His inability to find a business partner for the TRS service meant Dr. Liebermann had to set up the TRS center himself, through Publix, in order to operate the focus groups that were

essential for the success of the Signtel Interpreter. Publix immediately used Dr. Liebermann's technology for conference calls using TTY machines (technology that, as noted above, the major TRS providers – ATT, SBC, MCI, etc. – represented to the FCC did not exist and could not be developed as the "technology was infeasible"). Dr. Liebermann did not want to run a TRS call center, and did so only reluctantly. His focus was on the development of technology, and the call center was a means to enable his focus groups to work.

Dr. Liebermann treated the Deaf employees in the focus groups with dignity, and took their input and ideas extremely seriously. The employees themselves believed they were contributing to useful research and receiving meaningful employment. In addition, interacting with other Deaf employees through the focus groups led many employees to feel less isolated in their personal lives. Many came to consider their interactions with the focus groups like family, and would volunteer to work on holidays. Indeed, the first reaction most Deaf employees had to Dr. Liebermann was disbelief that he sincerely intended to develop assistive technology, because so few efforts to develop such technologies have ever been made and because Dr. Liebermann is not Deaf himself.

Publix and its sister companies grew faster than Dr. Liebermann ever anticipated, for several reasons. First, Dr. Liebermann possesses a scientist's desire for more data, because all other things being equal, more data lead to more statistically reliable results. Increasing the number of focus groups had the positive consequence of increasing reliability – and more "qualitative data" (creative ideas) also was generated. Second, TRS reimbursement paid for the costs associated with the focus groups. Third, Dr. Liebermann believed he was generating a public good – productive employment for Deaf individuals who otherwise had an extraordinarily difficult time finding a job.

### 4.    "Dotting"

While Publix had the technology to hold conference calls, the focus groups were limited by the technological shortcomings of the employees' TTY machines – indeed, the Signtel Interpreter and the Telephone for the Deaf were being designed in order to overcome those inherent shortcomings. In addition to the fact that TTY machines require the Deaf to use English and type and read using a small LCD screen, most TTY machines also turn "off" (disconnect) the telephone line when a certain time period (usually one to several minutes) passes with no electronic activity. If any of the four Deaf participants in a given conference call did not transmit for a period long enough to exceed the turn-off period of his or her TTY machine, the TTY machine would disconnect, and the focus group would have to wait until the CA was able to reconnect the dropped participant.

This possibility arose frequently during the focus group conference calls, for several reasons. First, the questions posed by Dr. Liebermann to each focus group required thoughtful, and often lengthy, answers. Conscientious employees therefore frequently took time to compose replies. Second, the Deaf employees were not communicating in their primary language, Signing, but in English – and employees had varying abilities to read, think and type in English. Finally, the focus groups worked in conference calls of four Deaf participants, requiring three participants to wait while a fourth typed a response over his or her TTY machine.[3]

Because of this shortcoming of the TTY machines, Dr. Liebermann instructed all employees to "dot" – regularly strike the "period" key of their TTY machines – when they were not typing responses on the conference calls. This method provided a uniform way of preventing

---

[3] Dr. Liebermann considered, and rejected, the idea of inventing a "fix" to the turn-off feature of the TTY machines. He thought the "dotting" would provide a simple solution, and he was investing his time in technologies that would make the TTY machine obsolete.

the turn-off problem, and it was easily identifiable on the typed transcripts of the conference calls.

Unfortunately, while the vast majority of the employees took their jobs extremely seriously, some employees (like employees at any company) occasionally did not – they occasionally "goofed off" during focus group calls. They "dotted" to remain connected in the conference calls, while they concurrently did other things at home and did not participate actively in the calls.

The improper "dotting" problem corresponded to a decline in the quality of the conference calls. In addition, the unplanned, organic growth of Publix and its sister companies, led to too many focus groups, too many Deaf focus group participants, too many employees in the Hamden call center, to be supervised effectively by Dr. Liebermann. The conference calls became less productive when focus group participants engaged in personal conversation rather than product development and no one stopped them.

Dr. Liebermann learned of the improper "dotting" practice in the context of these productivity issues. This problem, as with other types of poor employee productivity, was extremely difficult to prevent, because each Deaf employee was working in his or her own home elsewhere in the country, and was connected to the company only through their TTY machines. Dr. Liebermann took active steps to change employee behavior, but believed termination of employees was not a viable option because the employees depended on their jobs and finding employment was (and remains) generally so difficult for the Deaf.

In addition, it is now, as it was at the time, practically impossible to accurately separate "proper dotting" (dotting engaged in by those employees who needed to remain connected with calls, and who were faithfully participating in the focus group's discussion) from "improper

dotting" (dotting engaged in by those employees who wanted to stay connected with calls and appear as if they were participating, while they did not actually participate). Dr. Liebermann knew, however, that a portion of the minutes submitted to NECA for reimbursement contained this "improper dotting," and thus the claims submitted to NECA were not true and complete.[4]

### 5.    Dr. Liebermann's Use of TRS Funding

Dr. Liebermann's receipt of TRS funds (either those derived from improper dotting or, more generally, all funds received by Publix as a TRS service provider) was never motivated by financial gain. What is most striking about Dr. Liebermann's use of TRS funding, both during the two year period when he was receiving funding, and after funding was stopped and he relied on saved funds to continue operating the companies, is his lack of personal use of the funds.

Publix Network Corporation received funding from NECA for TRS services from March 1999 through March 2001. NECA conducted an audit of Publix on February 26-27, 2001, and on April 9, 2001 it gave notice to the company that it was placing reimbursements into escrow pending resolution of audit issues. Payments to Publix were never resumed.[5]

---

[4] As set out in **Tab E**, and as discussed above, the FCC very recently reduced its requirement that TRS suppliers provide teleconferencing for the Deaf. Through its Order, the FCC agrees to accept any method used by the telecommunications companies to achieve conferencing. Dr. Liebermann developed conferencing technology by 1999, and his technology, which was used under demanding field conditions for a period of two years, provided full conferencing for up to four Deaf persons. Given the state of TTY machine technology, however, regardless of the method used by the other telecommunications companies, they must permit (and bill NECA) for minutes of use involving dotting, because dotting necessarily must occur to keep the conference line open and all TTY machines on line.

[5] The FCC subsequently brought an administrative action against Dr. Liebermann and Publix, seeking reimbursement of funds paid to the company. Among other things, the FCC asserted that applicable regulations do not support full reimbursement for each "leg" (each caller) involved in a conference call taking place through a TRS center. It is exactly this issue that has delayed the development by other TRS providers of conference calling for TTY users. Dr. Liebermann and Publix are in the process of negotiating a consent decree, because their guilty pleas and the financial impact of the criminal case have left them unable to contest the administrative proceeding. Dr. Liebermann thus faces the prospect of a multi-million dollar consent decree entered against Publix and against him personally, in addition to the restitution order in this case.

During his operation of Publix, indeed, during all periods relevant to this case, Dr.
Liebermann continued to live extremely modestly, and he did not use the funding for personal
purposes. His family continued to depend chiefly on his wife's income to meet living expenses.
Rather, Dr. Liebermann used the NECA funding for the companies; the sole exceptions were two
$30,000 deposits Dr. Liebermann made into a retirement account, drawn from the salary he paid
himself while Publix received funding. For example, Dr. Liebermann made no improvements to
the Liebermann family's home in North Haven, Connecticut (the same house in which Dr.
Liebermann and his family have been living for thirty years), a 1,758 square foot house that was
appraised after his arrest at a value of $177,000. At the time of his arrest, the only cars owned by
the family were two Honda Accords.

    Dr. Liebermann accurately reported income and paid taxes on the TRS funding, and he
saved the company's income for use by the companies – and it was in fact so used. Dr.
Liebermann deposited $30,000 into a money purchase pension plan on two occasions during the
three years of Publix operations. This $60,000 was the total of the funds received from the
companies that Dr. Liebermann set aside for his own retirement.

    After TRS funding was discontinued in April 2001, Dr. Liebermann used the amount of
company funds (which then totaled approximately $2.9 million, including the salary he received
from the companies) to support the companies' continued operations through the first quarter of
2002, paying employees' salaries and benefits and all expenses of the companies. Dr.
Liebermann did not attempt to convert these savings for personal use, even after it became clear
that TRS funding was unlikely to be resumed and government scrutiny of Publix was
intensifying (e.g., during the NECA-ordered Arthur Andersen audit of Publix in June of 2001).
Instead, Dr. Liebermann continued to believe that a full investigation would vindicate Publix,

and he believed that the money held in bank accounts in either his own or the companies' names belonged to the companies and must be used for the benefit of the companies.

### 6.    Dr. Liebermann's Post-Arrest Conduct

Media reports of Dr. Liebermann's arrest on April 23, 2002, and again after his guilty plea on September 30, 2004, characterized him as preying on the Deaf. The blow of that portrayal was, and has continued to be, agonizing. Dr. Liebermann has focused for years on developing assistive technologies for the disabled, to the exclusion of material success, social interaction, even time with his family. He has been experiencing a major depression, from which he is still fighting to emerge.

Notwithstanding this impact, Dr. Liebermann did not give up on developing technologies. Although his assets were frozen, he supported these activities financially using his social security benefits. Since April of 2002, Dr. Liebermann has submitted a design for eTV (television for the deaf-blind) that was recently published by the U.S. Patent Office, and continued his development of Touch Language, a language for the deaf-blind that he is committed to place in the public domain. He also completed the design of the eCane, a navigation and communication device for the deaf-blind, which also was recently published by the Patent Office. In short, rather than becoming immobile following his arrest, Dr. Liebermann has continued to work on the same kinds of technologies that have long occupied his time.

## II.    Applicable Law

The facts underlying the offense, and the individual circumstances of the defendant, present extraordinary circumstances distinguishing this case. While a formal downward departure no longer is necessary following the Supreme Court's decision in United States v.

21

<u>Booker</u>, __ U.S. __, 125 S.Ct. 738 (2005), traditional departure analyses are set forth below to outline the arguments supporting the defendant's request for a sentence that does not include additional incarceration.

**A.    <u>United States v. Booker</u>**

As the Second Circuit recently stated, the Supreme Court's decision in <u>Booker</u> "makes the Guidelines advisory in nature, leaving sentences to the district court's discretion, guided by the Guidelines and the other factors of [18 U.S.C.] § 3553(a), and bounded by any applicable statutory minimum and maximum." <u>United States v. Sharpley</u>, __ F.3d __, 2005 WL 357449, at *3 (2d Cir. Feb. 16, 2005). Specifically, the <u>Booker</u> decision renders the Guidelines advisory, although strongly so:

> [T]he sentencing judge should decide, after considering the Guidelines and all the other factors set forth in section 3553(a), whether (i) to impose the sentence that would have been imposed under the Guidelines, *i.e.*, a sentence within the applicable Guidelines range or within permissible departure authority, or (ii) to impose a non-Guidelines sentence.

<u>United States v. Crosby</u>, __ F.3d __, 2005 WL 240916, at *7 (2d Cir. Feb. 2, 2005). Therefore, the Court need not depart downward in order to impose a lesser sentence than that mandated by the Guidelines. It may impose a non-Guidelines sentence on its own discretion, after considering the Guidelines and the full range of factors set forth in 18 U.S.C. § 3553(a). Traditional Guidelines analysis supports a non-custodial sentence on the following grounds.

**B.    Employment-Related Contributions (U.S.S.G. § 5H1.11)**

Employment-related contributions "are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range." U.S.S.G. § 5H1.6. However, employment-related contributions "may warrant a departure when present 'to an exceptional degree or in some other way [that] makes the case different from the ordinary case where the

factor is present.'" <u>United States v. Bruder</u>, 103 F. Supp. 2d 155, 183 (E.D.N.Y. 2000), <u>rev'd in part on other grounds sub nom.</u> <u>United States v. Schwartz</u>, 283 F.3d 76 (2d Cir. 2002) (quoting <u>Koon v. United States</u>, 518 U.S. 81, 96 (1996)).  Such contributions are especially relevant when they include police or military service, or heroic acts.  <u>See, e.g.</u>, <u>Bruder</u>, 103 F. Supp. 2d at 183-84; <u>United States v. Acosta</u>, 846 F. Supp. 278 (S.D.N.Y. 1994).

Dr. Liebermann has a history of achievement and dedication to assisting others, such as starting Project Support and his largely volunteer work for the New Haven Police Department's stress unit and hostage negotiation team.  His work history prior to starting Publix demonstrates selflessness and dedication.  Dr. Liebermann has not been content to help with others' projects; he has identified unmet needs and underserved populations, and with personal initiative and commitment he has worked to make a difference in people's lives.

There also is no dispute that Dr. Liebermann genuinely believes in the work the focus groups did through Publix, and the useful innovations that work helped develop.  The Signtel Interpreter works – the Deaf who have used it believe it is an amazing and useful invention.

C.    **Lack of Financial Motive for the Offense (U.S.S.G. § 5K2.0)**

"[A] district court can consider a defendant's initial lack of intent in granting a downward departure under § 5K2.0." <u>United States v. Nachamie</u>, 121 F. Supp. 2d 285, 297 (S.D.N.Y. 2000) (granting downward departure for initial lack of criminal intent); <u>see also</u> <u>Broderson</u>, 67 F.3d at 459 ("Although [the defendant] was charged and sentenced for fraud, his criminal intent was significantly different from that of the typical fraud defendant.  He did not set out to mislead the government."); <u>Koon</u>, 518 U.S. at 101-05 (upholding five-level departure where defendants were convicted of conduct that began as legal but became illegal).

As discussed above, Dr. Liebermann did not set out to defraud NECA, the FCC, or anyone else.  Publix developed organically, and it grew because Dr. Liebermann sought additional data through Deaf focus groups – not because Dr. Liebermann sought to enrich himself.  Money does not motivate Dr. Liebermann, and it never has.

### D.    Loss Overstates Seriousness of the Offense (U.S.S.G. § 2F1.1)

"[T]he loss determined under subsection (b)(1) may overstate the seriousness of the offense. . . .  In such cases, a downward departure may be warranted."  U.S.S.G. § 2F1.1 (Application Note 11).  Where a defendant's conduct "is translated to a sliding scale of offense levels, the assumptions underlying that translation cannot fairly reflect every possible case," and therefore "increasing the offense level for crimes of fraud based upon monetary loss may require downward departure if the seriousness of the offense is thus overstated."  United States v. Restrepo, 936 F.2d 661, 667 (2d Cir. 1991); see also United States v. Cheng, 96 F.3d 654, 656 (2d Cir. 1996) (affirming departure where "the district court departed downward 3 levels, because it concluded that the $3.5 million loss overstated the seriousness of the offense"); United States v. Broderson, 67 F.3d 452, 459 (2d Cir. 1995) (upholding seven-level departure where district court concluded that "the loss calculation of $2.2 million . . . overstated the seriousness of [the defendant's] offense").

As discussed above, the parties' agreement on $2 million, as the restitution amount applicable to this case, reflects an estimate of the total amount of "dotting."  It is impossible to estimate the proportion of "improper dotting" in the total amount of "dotting," although it likely is extremely low.  Deaf employees understood the need to dot to keep their TTY machines connected during conference calls; indeed, their failure to dot, if it resulted in the disconnection of their TTY machines, would result in disruption of their focus group's work.  Excessive dotting

24

would have skewed the results from the focus groups, making it much more difficult to find connections between ideas or responses to questions. Employees also understood that if improper "dotting" occurred in any significant way, it would have signaled the collapse of the focus group system, immediately affecting the quantity (and quality) of the responses and thereby hurting the technological developments that depended on their work.

In sum, the $2 million loss amount greatly overstates the seriousness of the offense, and a downward departure would be appropriate on this ground.

**E.     Aberrant Behavior (U.S.S.G. § 5K2.20)**

A sentence below the applicable guideline range may be warranted in an extraordinary case if a defendant's criminal conduct constituted aberrant behavior.[6]  In <u>Zecevic v. United States Parole Commission</u>, 163 F.3d 731, 735-36 (2d Cir.1998), the Second Circuit applied the totality of the circumstances test to recognize that the Guidelines refer to "single acts of aberrant behavior that still may justify probation at higher offense levels through departures."  The Court in <u>Zecevic</u> held that "single acts of aberrant behavior" should be assessed "in the context of the defendant's day-to-day life" rather than solely "with reference to the particular crime committed." <u>Id.</u> at 735; <u>see also</u> <u>United States v. Martinez</u>, 207 F.3d 133, 137 (2d Cir. 2000).

Significantly, the Sentencing Commission has rejected the view that an aberrant behavior departure requires a single spontaneous act.  As the Second Circuit stated in <u>United States v. Castellanos</u>, 355 F.3d 56, 59, (2d Cir. 2003):

---

[6] None of the restrictions set forth in U.S.S.G. § 5K2.20 apply to this case.  The Application Notes to this section go on to define "aberrant behavior" in detail.  Application Note 1 states: "For purposes of this policy statement—'Aberrant behavior' means a single criminal occurrence or single criminal transaction that (A) was committed without significant planning; (B) was of limited duration; and (C) represents a marked deviation from an otherwise law-abiding life." Application Note 2 states: "In determining whether the court should depart on the basis of aberrant behavior, the court may consider the defendant's (A) mental and emotional conditions; (B) employment record; (C) record of prior good works; (D) motivation for committing the offense; and (E) efforts to mitigate the effects of the offense."

> Under the Guidelines, absence or presence of spontaneity *alone*
> never determines whether criminal conduct is aberrant behavior. A
> non-spontaneous criminal act might be aberrant behavior. Even
> though not committed entirely without planning, it might
> nevertheless have been committed without "significant" planning,
> be of limited duration, and constitute a marked deviation from an
> otherwise law-abiding life.

As discussed above, "improper" dotting occurred after Dr. Liebermann knew employees were dotting during focus group conference calls, and did not take sufficiently strong steps to stop it. Publix employees thus submitted records of monthly minutes of use to NECA for reimbursement which included such minutes, and Dr. Liebermann consciously avoided taking steps to prevent the submission of the resulting false requests. This conduct, while not strictly "spontaneous," was not deliberative or planned – indeed, this case stretches the application of the "more than minimal planning" enhancement to § 2F1.1. Dr. Liebermann simply did not do enough to stop an improper practice, and his omission became criminal when he knew monthly minutes of use were being submitted to NECA for reimbursement which included minutes involving such "improper" dotting.

As set forth in the Presentence Report and further amplified above, Dr. Liebermann's personal history contains no hint of similar conduct. Indeed, as reflected in the letters and comments of those who know him best, such conduct is completely out of character for him. In short, this offense represents a marked deviation from Dr. Liebermann's otherwise law-abiding life.

E.     **Combination of Characteristics and Circumstances Outside the Heartland (U.S.S.G. § 5K2.0)**

As this Court held, and as the Second Circuit Agreed, "[i]n extraordinary cases . . . the district court may downwardly depart when a number of factors that, when considered

26

individually, would not permit a downward departure, combine to create a situation that 'differs significantly from the "heartland" cases covered by the guidelines.'" *United States v. Rioux*, 97 F.3d 648, 663 (2d Cir. 1996). Therefore, even if the Court determines that none of the foregoing factors is individually sufficient to warrant departure, it may downwardly depart because the combined circumstances of the case are extraordinary.

In sum: Dr. Liebermann's lifelong efforts to assist others, without an interest in obtaining material benefit for himself, the true degree of the loss, and the aberrant nature of his conduct, are extraordinary when taken together and as a whole. This is not a typical case, nor a typical defendant.

In addition, while not independently sufficient for an "extraordinary family circumstances" departure,[7] the Court may consider the nature of Dr. Liebermann's relationship with his wife when viewing the facts in their totality. Dr. Liebermann and Nechama Liebermann have been socially isolated by their immigrant background and Dr. Liebermann's long-time focus on his work. The inter-dependent nature of their relationship means that the negative impact on Nechama, should the Court incarcerate Dr. Liebermann, will be very significant.

**F.    Additional Relevant Sentencing Factors**

Three factors relevant to sentencing derive from the period between Dr. Liebermann's arrest on April 23, 2002, and the sentencing hearing.

First, Dr. Liebermann was detained for three days after his arrest at Wyatt FCI. He was released on conditions of home confinement and electronic monitoring on April 25, 2002. The

---

[7] Guidelines departures for family ties and responsibilities, pursuant to U.S.S.G. § 5H1.6, are appropriate where circumstances are extraordinary. See, e.g., United States v. Alba, 933 F.2d 1117, 1122 (2d Cir. 1991) (upholding departure where "incarceration in accordance with the Guidelines might well result in the destruction of an otherwise strong family unit"); United States v. Galante, 111 F.3d 1029, 1035 (2d Cir. 1997) (affirming departure where "if defendant were imprisoned the family unit would probably be destroyed").

defendant thus already has experienced incarceration. For a then-sixty three year old man never before arrested or even suspected of any crime, this incarceration came as a profound shock. Its deterrent impact cannot be underestimated.

Second, following his release on April 25, 2002, Dr. Liebermann took the obligations of home confinement with electronic monitoring extremely seriously. He religiously turned in to Pre-trial Services his detailed personal logs of time spent outside his home – they are minute-by-minute records. At the suggestion of the Pre-Trial Services Office, the Court removed the electronic bracelet from Dr. Liebermann on June 1, 2004 (after over two years). Dr. Liebermann continues on release on conditions of home confinement.

Third, on two occasions the Court has permitted Dr. Liebermann to travel to Israel to visit his mother, who is elderly and in ill health. On the first such trip (September 2003) Dr. Liebermann obtained his two passports from the Clerk of Court (Dr. Liebermann holds dual citizenship in the U.S. and Israel). While in Israel he learned that his Israeli passport had expired, and he obtained a new and updated passport. Thereafter, upon his return to the United States, Dr. Liebermann returned his American passport and his new Israeli passport to the Clerk's Office, even though it had a record of releasing to him his American passport and his original Israeli passport. Dr. Liebermann took his second trip to visit his mother in May of 2004.

### Conclusion

The factors set forth in 18 U.S.C. § 3553(a) support a non-custodial sentence in this case. A non-custodial sentence will reflect the seriousness of the offense, promote respect for the law, and provide just punishment. There is no reasonable risk that Dr. Liebermann ever will return to the criminal justice system, and there is no basis to believe the public needs protection from him.

28

His detention at Wyatt FCI, his home confinement during this case, and the substantial restitution and civil judgments he faces provide ample deterrence to anyone intending to mislead the FCC when providing TRS services.

Finally, the impact of being branded as a criminal cannot be understated. The fact of his conviction is of profound dismay to Dr. Liebermann personally. He therefore faces significant obstacles to his future attempts to develop and promote the assistive technologies on which he has invested decades of his life.

In sum, the sentencing factors outlined in 18 U.S.C. § 3553 support a decision to depart downward and sentence Dr. Liebermann to a term of probation.

Respectfully submitted,

DEFENDANT RAANAN LIEBERMANN

By: _____

Gates Garrity-Rokous (ct 15218)
Wiggin and Dana LLP
One Century Tower
P.O. Box 1832
New Haven, CT  06508-1832
(203) 498-4400
(203) 782-2889 (facsimile)
ggr@wiggin.com