TAB A

# PROJECT SUPPORT

## WHO CAN BENEFIT FROM PROJECT SUPPORT?

Unemployment is a common experience today. Still, being unemployed brings with it many difficulties. If you are unemployed you probably know that self-confidence, life-style and family life can suffer as a result. If you are close to someone out of work, you may also be effected.

## HOW DOES PROJECT SUPPORT WORK?

The staff at Project Support is trained to help you deal with the personal difficulties that unemployment often brings . . . confusion, tension, frustration, anger, etc. We also have information to help you find ways to manage money matters, legal issues or medical problems.

## WHAT KINDS OF HELP DOES PROJECT SUPPORT OFFER?

Project Support provides several kinds of help:
1) Counseling for on-the-job problems before they get out of hand.
2) Supportive counseling for individuals out of work and their families.
3) Help in developing job hunting skills and techniques.
4) Discussion groups focusing on experiences with unemployment.
5) Information on existing community services providing food, clothing, shelter, assistance with utility costs, etc.
6) Ongoing help in adjustment to new job.
7) For special problems appropriate referrals can be made.

## CAN I AFFORD PROJECT SUPPORT'S SERVICES?

Our fees are rated according to your ability to pay, and our present policy is that no one be denied services due to lack of resources. Third party payments are accepted.

Call us for an appointment at Project Support, 777-1665, or drop in for more information at 150 Dwight Street.

**THE**
**CONNECTICUT**
**MENTAL**
**HEALTH**
**CENTER**



P.O. BOX 1842    34 PARK STREET    NEW HAVEN, CONNECTICUT 06508    TEL. 789-7300

September 12, 1978

Dr. R. Liebermann
Project Support
150 Dwight Street
New Haven, Connecticut

Dear Dr. Liebermann:

The Service which you render the unemployed is unique and very important. We deal with a community of underprivileged persons where unemployement is rather high. We will undoubtedly continue to refer clients to you.

I hope that you will be able to enlarge your staff so that we may be able to refer more people to you and better satisfy the needs of those in our community who need your services.

Sergio Mejia, M.D.
Clinical Director
Hispanic Services Division.

A COOPERATIVE ENDEAVOR OF: THE STATE OF CONNECTICUT, DEPARTMENT OF MENTAL HEALTH

YALE UNIVERSITY SCHOOLS OF MEDICINE AND NURSING    THE YALE-NEW HAVEN HOSPITAL, INC.

THE HOSPITAL OF ST. RAPHAEL
NEW HAVEN, CONNECTICUT 06511

September 11, 1978

Ron Lieberman, Ph.D.
Director, Project Support
150 Dwight Street
New Haven, Connecticut

Dear Dr. Lieberman:

I am happy to provide this letter documenting the cooperative relationship between our agencies.

As you know, there has been mutual benefit derived for your clients as well as our patients. Our staff continues to make appropriate referrals to your program and are pleased with the support and direction you provide. Referrals from your program to our clinic have similarly been accomplished effectively and provided a very useful level of continuity for them.

I look forward to our continued work together.

Sincerely,

Donald Grinder, Ph.D., Assistant Director
Psychiatric Outpatient Clinic

DG/bg

TAB B



# DEPARTMENT OF POLICE SERVICE
# NEW HAVEN CONN        06519

BIAGIO DILIETO, MAYOR — EDWARD MORRONE, CHIEF OF POLICE

January 31, 1980


Dr. R. Liebermann
CERLAS Division of Mental Health
100 York Street
New Haven, Connecticut  06511

Dear Dr. Liebermann:

I would like to commend the outstanding assistance rendered by
CERLAS, Division of Mental Health to the New Haven Department
of Police Service in establishing training, and the continuous
operation of the department's Stress Unit.

Of course, without your personal touch, all the hard work and
planning certainly would not have jelled.

With this in mind, I again call upon you for additional assistance.
As you may recall when the Stress Unit was being formed much thought
was given to training some police officers wives to be part of the
Stress Unit Staff of Peer Counselors.  Due to priorities this was
limited to two (2) wives on a part-time basis.

Since the unit has been operational many situations have arisen
that required the need for not only a female, but the understanding
of problems only the wife of a police officer would comprehend.

The need is apparent for a training period of some type for selected
wives of police officers, which would assist greatly in the operations
of our Stress Unit.  I ask that you,through CERLAS, take on this
responsibility.

I know the expense of such an undertaking, but the budget of this
department at present allows for no funding that would be of
assistance.  Would it be possible to apply for funds via a grant
that would enable such a program to exist?


                              Continued...


ADDRESS ALL COMMUNICATIONS TO THE CHIEF OF POLICE

...Continued page II

Dr. Liebermann

January 31, 1980

This program would serve as a joint effort between the New Haven
Police Department and CERLAS, Division of Mental Health, where
such fiscal and operational responsibilities will be shared.

Sincerely,

William F. Farrell
Director-Support Services Division


WFF/vh

6 of 19 DOCUMENTS

Copyright 1981 The New York Times Company
The New York Times

June 3, 1981, Wednesday, Late City Final Edition

**SECTION:** Section B; Page 2, Column 4; Metropolitan Desk

**LENGTH:** 585 words

**HEADLINE:** NURSING HOME HOSTAGES FREED IN NEW HAVEN

**BYLINE:** By ROBERT E. TOMASSON, Special to the New York Times

**DATELINE:** NEW HAVEN, June 2

**BODY:**

Armed with a shotgun and an automatic handgun, a 59-year-old man held 16 staff members of a convalescent home hostage for seven hours before he was subdued by the police in a struggle that left one nurse seriously wounded by a shotgun blast.

"Thank God, apparently all of the 195 patients slept through it," said Vincent Distasio, the home's assistant administrator. The gunman, identified by the police as Dominic Giordano, entered the New Fairview Hall Convalescent Home at about 10:30 last night angrily seeking his 19-year-old daughter, Denise, a nurse's aide who worked at the private nursing facility but who had left for the night. Throughout the night, he kept scores of policemen at bay while he alternately terrorized and sympathized with some of the staff members.

Nurses were allowed to make their rounds, Mr. Distasio said, and were also permitted to make trips to the kitchen out of sight of the armed man. Throughout the night, they returned to the second-floor nursing station where Mr. Giordano remained with his weapons.

"They felt they couldn't leave their patients," Mr. Distasio said.

Approached by Guard

The police, Mr. Distasio and others at the institution gave this account of the siege of the nursing home, which is on Clifton Street in an area of modest, tidy homes in a working-class neighborhood in the northern part of the city:

Just before the 11 P.M. shift was due to report, a car drove into the home's parking lot and was approached, as is normal at that time of night, by an unarmed security guard. A man got out of the car with a shotgun and handgun and forced the guard through the double doors, past the rooms of sleeping, elderly patients and down the corridor to the nurses' station.

According to the police, the guard said the man was looking for his daughter, who had recently stopped living at her parents' home on Columbus Avenue. The police said Mr. Giordano told the security guard that he wanted to "blow her legs off" so she could not leave home. The Giordanos have three other daughters, the police said.

The nightlong standoff began when Mr. Giordano was told that she had left for the night. Staff members had free access to telephones, and police hostage negotiators and reporters made frequent calls into the hospital. Mr. Giordano permitted several nurses who had finished their shifts to leave the three-story building.

Shotguns Go Off

After repeated demands by Mr. Giordano that his daughter be brought to the scene, she arrived from a friend's home. The police told the father that she would meet him at the bottom of the stairs by the nursing station.

Pushing three nurses in front of him, shotgun in one hand, .25-caliber automatic in the other, the police said, Mr.

The New York Times, June 3, 1981

Giordano pushed open the stairwell door. Behind the door, Sgt. Steven Tiddei and other members of a Special Weapons and Tactics group were pressed against the tile wall, holding shotguns.

When Mr. Giordano stepped into the stairwell, an officer slapped Mr. Giordano's shotgun to the floor and it discharged. A brief, but violent tussle ensued, and an officer's shotgun fired accidentially, according to Police Chief Edward Morrone.

Donna Lucas, 27, one of the nurses, suffered shotgun wounds of the head and neck, according to a spokesman at Yale–New Haven Hospital, where she was reported in fair condition.

**GRAPHIC:** Illustrations: photo of Poilcmen, and Members of hostage



# DEPARTMENT OF POLICE SERVICE

# NEW HAVEN CONN     06519

BIAGIO DILIETO, MAYOR — EDWARD MORRONE, CHIEF OF POLICE

*September 3, 1981*

Raanan Liebermann, PhD
79 Bayard Avenue
North Haven, Connecticut 06473

Dear Dr. Liebermann:

I am proud to inform you that the Board of Police Commissioners
has voted to award you a Letter of Appreciation for your very
valuable contribution to the New Haven Police Department on
June 1 and 2, 1981 at the Hostage Situation at the New Fairview
Convalescent Hospital.

I am sure that you are aware of the lengthy, tense negotiation
period which preceded the successful conclusion to the poten-
tially violent situation.   Your advice and assistance to the
Department's Hostage Negotiators is appreciated by the Board
and the entire Department.

As the Department's Stress Unit Physician you have provided a
valuable contribution on this and other occasions in a pro-
fessional and effective manner.

On behalf of the Board please accept this letter as appreciation
and gratitude for your continued commitment to the goals and
ideals of the Department of Police Service.

Sincerely,

Joseph M. Adelizzi
President
Board of Police Commissioners

55 of 64 DOCUMENTS

Copyright 1982 U.P.I.

United Press International

May 19, 1982, Wednesday, PM cycle

SECTION: Domestic News

LENGTH: 1044 words

BYLINE: By MARK A. DUPUIS

DATELINE: NEW HAVEN, Conn.

BODY:

A mental patient who held a nurse and five patients hostage for 14 hours was undergoing routine outpatient therapy when he whipped out a gun and ''completely surprised'' the group, mental health officials said.

The drama for the six shaken but otherwise unharmed hostages ended peacefully at 8:09 a.m. when Charles Watson, 30, of New Haven, surrendered to SWAT police inside the mental health center on Park street.

Watson, who complained of a plot against his family, was taken to Middletown for observation at the state's facility for the criminally insane, said Police Chief William Farrell.

One question raised was how Watson entered the building with a loaded gun.

Deputy Mental Health Commissioner Ralph Adkins said Watson was on his way to his usual therapy session and was familiar to employees including two unarmed security guards.

''No one anticipated he would be carrying the weapon, they were completely surprised,'' said Adkins.

Adkins said Watson entered the building about 5:30 p.m. Tuesday to attend his usual therapy session in a secnd floor conference room.

''He showed a .38 caliber revolver and pointed it at the two men and three women patients and therapist Michele Corall,'' Adkins said, warning he would ''blow heads off'' if police approached.

Adkins said Ms. Corall was a staff psychiatric nurse ''specially trained and qualified as a group leader for such sessions.''

Watson, who was arrested previously in New Haven on an assault charge, was arrested at 8:10 a.m. as he emerged from a second–floor conference room in the Connecticut Mental Health Center, Farrell said.

''The hostages are all safe and sound, a little bit shaken up,'' Farrell said.

Watson sat up straight as he was carried from a side door at the center strapped tightly to a stretcher. He was placed in an ambulance and taken to the Whiting Forensic Institute in Middletown for 15 days observation, Farrell said.

When the siege began Watson threatened to ''blow heads off'' if police rushed the room.

One hostage was released about midnight, two more around 1 a.m. and a fourth at 5:15 a.m.

Police persuaded Watson to release the final two hostages and walk out of the conference room three hours later. Members of the New Haven SWAT team grabbed Watson as he emerged in the hallway.

Farrell said his department had been unable to determine a specific motive. ''He was quite upset and unable to provide us with anything we could substantiate,'' he said.

Farrell said his department would look into the complaint that Watson was provoked by a plot against his family.

United Press International May 19, 1982, Wednesday, PM cycle

''Every phase of this will be checked out by the detectives division,'' Farrell said. Police were alerted when Watson called a New Haven television station and said he was holding six hostages at the mental health center.

The New Haven Journal-Courier identified the six people taken hostage as David Bossesky, Michelle Corall, Julie Clemente, Nancy Clark, Gretchen Holland, and a man identified only as Ray.

Watson released the two hostages at 1 a.m. after police arranged to grant a demand to have his story told on New York radio station WCBS.

One other patient and the group therapist were the final two hostages held in a second-floor room at the rear of the building — a modern brick and glass structure adjacent to the sprawling Yale–New Haven Hospital complex on the fringe of downtown New Haven.

New Haven television station WTNH said a man identifying himself as Watson called the station about 5:30 p.m. and said he was holding hostages at the Mental Health Center.

Ken Venit, a producer at WTNH, talked with Watson and asked him if he was all right.

''Yeah, I'm okay,'' Watson replied. ''I want you to deliver this message. Tell them I'm in this room, but when they find out where I'm at, tell them as soon as they come into this room, I'm going to start blowing heads off.''

After Watson demanded that his story be told on WCBS, a police sergeant related Watson's story on the air — including Watson's claim that a ''contract'' was out on his family.

Watson earlier asked to speak with Gov. William O'Neill and New Haven Mayor Biagio DiLieto, WTNH–TV reported. But police declined to say whether the governor and mayor were contacted.

The siege began at 5:40 p.m. EDT, police said, but news of the hostage-taking was not released until 11 p.m. for fear publicity would have a ''negative'' impact on negotiations.

In a conversation with Ken Venit, a WTNH producer, Venit asked Watson if he was all right.

''Yeah, I'm okay,'' Watson replied. ''I want you to deliver this message. Tell them I'm in this room, but when they find out where I'm at, tell them as soon as they come into this room, I'm going to start blowing heads off.''

Farrell said he understood the handgun Watson carried was loaded.

Members of New Haven's police hostage negotiating team and the SWAT team rushed to the scene and opened negotiations, although Farrell said police had difficulty understanding Watson's demands.

''We kept a phone line conversation with him at all times,'' Farrell said. ''At the end, the agreement was that he would follow the plan we had recommended. I think he was worn down. Still and all, we had to be cautious.''

Farrell said his department had been unable to determine a specific motive. ''He was quite upset and unable to provide us with anything we could substantiate,'' he said.

Watson was granted a demand to have his story told on WCBS radio in New York City, with a New Haven police sergeant delivering the radio message that included an allegation a contract was out on his family. Watson had said earlier New Haven police and the FBI had ignored his complaint.

Farrell said his department would look into the complaint that Watson was provoked by a plot against his family. ''Every phase of this will be checked out by the detectives division,'' Farrell said.

The incident was New Haven's third major hostage situation in the past year. Hostages were held during the past year at a nursing home and a halfway house.

The Journal-Courier, New Haven's morning newspaper, said the hostages were tentatively identified as David Bossesky, Michele Corall, Julie Clemente, Nancy Cark, Gretchen Holland and a man identified only as Ray.

# Certificate of Commendation

## AWARDED TO

## DOCTOR RAANAN LIEBERMANN

• DEPARTMENT OF POLICE SERVICE • NEW HAVEN • CITY OF NEW HAVEN •

_William F. Farrell_
CHIEF

_Roger W. Pelo._
MAYOR

BOARD OF POLICE COMMISSIONERS

_Jos. M. Adelman_
PRESIDENT

DEPARTMENT OF POLICE SERVICE

NEW HAVEN CONN        06519

BIAGIO DiLIETO, MAYOR — WILLIAM F. FARRELL, CHIEF OF POLICE

December 12, 1983

Honorable Board of Aldermen
200 Orange Street
New Haven, Connecticut  06510

Re: Hold Harmless Agreement
    Raanan Lieberman, PhD

Dear Honorable Members:

It is respectfully requested that your Honorable Board approve by unanimous
consent, an agreement by which the City will "hold harmless" C.E.R.L.A.S.
and Dr. Raanan Liebermann from any claims arising out of his contractual
duties to this department as professional consultant to the Department's
Peer Counseling (Stress) Unit.

Dr. Liebermann's involvement with the Peer Counseling (Stress) Unit dates
back to it's earliest beginning in April 1979.  From this early beginning
Dr. Liebermann has worked closely with department managers formalizing the
concept and assisting in the development of operational goals and objectives
that have gained acceptance from all involved in it's operation.  Dr. Liebermann
has further assisted the Department's Hostage Negotiation Team by providing
evaluation, training, and professional input. Assistance which has in no small
way played an important part in the successful resolution of several incidents
involving unit members.  Finally, throughout the course of our long relation-
ship, Dr. Liebermann has gained the trust and confidence of both managers and
subordinates alike.  A trust and confidence which translates into a working
relationship that would be nearly impossible to replicate without extensive
search and trial under fire.

It is respectfully requested that your Honorable Board approve the following
language, or language substantially similar, which will be contained within
the body of the agreement between the City and its Department of Police Service
and C.E.R.L.A.S. and Dr. Raanan Liebermann;

Page 2
December 12, 1983
Honorable Board of Aldermen

"The City shall indemnify and hold harmless C.E.R.L.A.S. and Dr. Raanan
Liebermann from any and all claims against either C.E.R.L.A.S. or Dr.
Raanan Lieberman, or both arising out of the performance of the duties
of this contract.  Provided that the City will not indemnify and hold
harmless C.E.R.L.A.S. or Dr. Raanan Liebermann for claims arising out
of acts which are wanton and willfull."

Respectfully submitted,

*William F. Farrell*
WILLIAM F. FARRELL
Chief of Police


WFF/lcm
enclosure

ORDER OF THE BOARD OF ALDERMEN OF THE CITY OF NEW HAVEN
AUTHORIZING AN AGREEMENT BY WHICH THE CITY WILL HOLD
HARMLESS C.E.R.L.A.S. AND/OR DR. RAANAN LIEBERMANN
FROM CLAIMS ARISING OUT OF THEIR PARTICIPATION IN
THE DUTIES INCLUDED IN A CONTRACTUAL AGREEMENT
BETWEEN THE CITY AND ITS DEPARTMENT OF POLICE
SERVICE WHILE THE CONTRACT REMAINS IN EFFECT

WHEREAS, C.E.R.L.A.S. and Dr. Raanan Liebermann should be able to perform

the function of advisor to the Hostage Negotiation Team and Stress Units; and

WHEREAS, C.E.R.L.A.S. and Dr. Raanan Liebermann has exhibited consistant

success in many problem situations; and

WHEREAS, C.E.R.L.A.S. and Dr. Raanan Liebermann need to be free of concern

of claims while assisting negotiators in hostage situations,

NOW, THEREFORE BE IT ORDERED, by The Board of Aldermen of the City of

New Haven that the Mayor is authorized to execute a contract between C.E.R.L.A.S.

and Dr. Raanan Liebermann with the provision as follows or one substantially

similar thereto:

"The City shall indemnify and hold harmless C.E.R.L.A.S. and Dr. Raanan

Liebermann from any and all claims against either C.E.R.L.A.S. or Dr. Raanan

Liebermann, or both arising out of the performance of the duties of this contract.

Provided  that  the City will not indemnify and hold harmless C.E.R.L.A.S. or

Dr. Raanan Liebermann for claims arising out of acts which are wanton and willfull."

TAB C

English

**Radio Nederland**
Theme: science        other themes | news | about RNW

Science Home

Archive Home

# Linking Languages

*by Laura Durnford of our Science Unit, 20 November 2001*

**Learning to read and write is a hard task for anyone, but for deaf children it poses an extra challenge. The written alphabet symbolizes sounds that they cannot hear. To help deaf children develop literacy skills, a team of researchers has devised a new educational scheme that builds linguistic bridges between Sign Language and written English - beginning with a new 'alphabet'.**



"You have to learn to read before you can read to learn," says Dr Sam Supalla, an Associate Professor in the Department of Special Education, Rehabilitation and School Psychology at the University of Arizona, Tucson, USA. "On average deaf students have been graduating from high school in the US, at age 18, with a 3rd or 4th Grade reading level (age 8-10). Since that's the age where reading becomes more important for learning, rather than reading for reading's sake, that's had a huge impact on deaf children's academic success in their later years."

*real*    **Featured on our programme, The Research File. Click to hear the full report.**

### Twin Challenge
Part of the problem in the past has been that people didn't recognise Sign Language as the 'mother tongue' of deaf children, or even as a real language at all, and they often blamed academic failure on deafness itself. But this view has now changed, according to Dr Cecile McKee, a University of Arizona Professor of Linguistics who's currently on loan to the National Science Foundation.

"Deaf people learn language completely normally if it's accessible to them. So deaf children of deaf parents, who are exposed to American Sign Language, learn ASL in exactly the same developmental sequences as hearing children learn English. But deaf children may have to learn English only through print. They have to learn to read the language before they can learn the language. The problem is, they have to do both projects at the same time."

### Alphabetic Principle
Dr McKee says that a major project for deaf children is to learn the alphabet. Each letter stands for a sound or variety of sounds – and that idea is just not accessible to deaf children. An equivalent might be for a person with no sense of smell to visit a world where everybody communicated using complex and subtle odours, and to learn to read and write the written form of that language, whilst having no concept of the smells being represented in print.

To bridge this conceptual divide Dr Supalla



**'Cat' in graphemes and
sign language.**

and his team devised a new 'alphabet' of 32 symbols, called 'graphemes', that represent the basic elements of ASL. "Hand-shape, movement and location are the building blocks of an ASL sign, just like vowels, consonants and syllables are the building blocks of an English word," says Dr McKee. "We are using this 'alphabet' to teach children how an alphabet works."

### Gloss and Polish

The scheme begins by representing ASL signs as line drawings. Then the relevant graphemes are added, building up to the word to be learned in English (see diagram). As the children progress through the program, they can use special bilingual dictionaries to independently look up words spelled in graphemes or in English. And they can also 'read aloud' from other resource books in which English language stories have been transcribed into 'gloss' – an intermediate form between written English and ASL, which clarifies their grammatical and structural differences.

Sam Supalla: "Writing in capitals indicates a gloss. When I want to write a sentence I follow the structure of ASL, but the English words are there in the gloss and that helps a deaf child to make the bridge to English." The teachers then lead the children through an analysis of how the two languages compare. "For example, in 'I am happy', 'I' becomes the first person singular 'IX-1', which means an index pointing towards oneself. We know whether it's a subject or an object – 'I' or 'me' – by the word order of the sentence. It's a very intellectually stimulating activity for our kids."



**I am happy
IX-1 HAPPY**

**A sentence in English
and 'gloss'.**
'IX-1' indicates the index
finger pointing to oneself,
i.e. representing the
English wors 'I' or 'me'.

### New Approach

By 3rd Grade the children can recognise around 5000 words in English and should have sufficient foundational skills that they can manage without the gloss. "These tools help make the transition from their first language, ASL, to printed English and then the tools go away and the children just work with printed English," explains Dr Supalla. "It seems pretty obvious and logical, but it's not something that's been done before."

### Laboratory School

The research team has been collaborating with a special 'laboratory' school in Tucson – the Laurent Clerc Elementary – to pilot the new scheme. So far they've been in the initial phases, but now they need more schools to try the programme and provide feedback so they can scientifically determine the success of their alphabetic approach to deaf education.

In the meantime the children who are already participating in the scheme seem to be benefiting -



as Research Assistant Jody Cripps explains. "I remember one child who knew the graphemes and was signing a word out, just as a hearing child would sound out a word. And that's when it really hit me hard that that's what this is all about. The child was able to correct himself and struggle through and was so very pleased having figured it out."

### Links

- Laurent Clerc Elementary School
- Dr Supalla's page at the University of Arizona
- Dr McKee's page at the University of Arizona
- National Association of the Deaf (NAD - USA) page about Jody Cripps

© 2002              Send us an email.          **Radio Netherlands** | 

Tab D




**News**

| Home | Site Map | Search | Contact Us | Help |    Jump To Section    Go

**PUBLICATIONS**

| About the PUC | → |
| Consumer Information | → |
| Open Meetings | → |
| Electric | → |
| Telecommunications | → |
| Rules and Laws | → |
| Filings - Interchange | → |
| PUC Publications | → |
| Relay Texas/STAP | → |

# Relay Texas Program Gets FCC OK

## Telephone Service Approved for Deaf and Hard-of-hearing

Contact:
Terry Hadley 512-936-7135
Pager: 512-322-1457

**Tuesday, June 10, 2003** -- The Texas program for deaf and speech-disabled telephone customers has received federal approval to continue operations for another five years.

In May the Federal Communications Commission (FCC) certified that Relay Texas meets or exceeds all federal standards, including appropriate measures for enforcement. The certification runs through July 2008.

Relay Texas is a round-the-clock telephone interpreting service between customers who can hear and the more than 1.8 million Texans who are deaf, hard-of-hearing, deaf-blind or speech-disabled. The Texas legislature authorized Relay Texas in 1989. Operations began in September 1990.

Relay Texas handles approximately 400,000 calls per month at no charge to the Relay user. There are no restrictions on the length or number of calls placed. Almost all of the $11.5 million annual budget for Relay Texas is paid for by the Texas Universal Service Fund (TUSF), which is supported by all Texas telephone customers, including pager and wireless customers. Approximately 2.1 percent of the TUSF goes to Relay Texas.

One feature of Relay Texas is its Video Relay Service (VRS). VRS lets phone customers use American Sign Language to reach a trained interpreter with desktop video to communicate with any phone customer in the United States. For more information on VRS, including equipment availability, contact Sprint-Relay Texas at 512-873-1000 (TTY: 800-578-6275).

All PUC News Releases are available at www.puc.state.tx.us

Last Updated: 06/10/03

| Current/2005 | 2004 | 2003 | 2002 | 2001 | 2000 | 1999 | 1998 | 1997 |

• Site Map • Search • About PUCT • Hot Topics • Calendar • Commissioners • Careers • Contact Us •
• Consumer Information • Electric • Filings - Interchange • News Releases • Open Meetings •
• Publications • Relay Texas • Rules & Laws • Telecommunications • PUC Home •
• Help • Electric Choice • Telephone Choice • State of Texas •

**Call the Assistance Hot Line 1-888-782-8477 or File a Complaint Online**

Compact with Texans

Privacy Policy Notice - Link Policy - Accessibility Policy
Request for Documents / Open Records Request Policy

Copyright 1998-2005 Public Utility Commission of Texas.

TAB E

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| Telecommunications Relay Services | ) |
| and Speech-to-Speech Services for | ) CC Docket No. 98-67 |
| Individuals with Hearing and Speech | ) |
| Disabilities | ) CG Docket No. 03-123 |
| | ) |
| | ) |
| | ) |

**ORDER**

**Adopted: February 17, 2005**          **Released: February 18, 2005**

By the Chief, Consumer & Governmental Affairs Bureau:

        1.      This *Order* addresses the current waiver of the telecommunications relay services (TRS)[1] requirement that TRS providers (including providers of captioned telephone service) offer three-way calling functionality as a TRS mandatory minimum standard.[2]  On February 24, 2005, the one-year waiver of this requirement will expire.[3]  This *Order* clarifies the manner in which TRS providers may comply with this rule; as a result, a waiver of this requirement is no longer necessary.

**I.      BACKGROUND**

        2.      In the *Second Improved TRS Order & NPRM,* the Commission required that TRS providers offer three-way calling as a standard feature of TRS.[4]  We defined three-way calling to be a TRS feature that allows more than two parties to be on the telephone line at the same time with the communications assistant (CA).[5]  We stated that three-way calling could be arranged in one of two ways: first, the TRS consumer may request that the TRS facility and the CA set up the call with two other

---

[1] The term telecommunications relay service (TRS) means "telephone transmission services that provide the ability for an individual who has a hearing or speech disability to engage in communication by wire or radio with a hearing individual in a manner that is functionally equivalent to the ability of an individual who does not have a hearing or speech disability to communicate using voice communication service by wire or radio." 47 U.S.C. § 225(a)(3).

[2] 47 C.F.R. §§ 64.601(16) (defining three-way calling) & 64.604(a)(3)(vi) (requiring three-way calling as a TRS mandatory minimum standard).

[3] *See Telecommunications Relay Services and Speech-to-Speech Services for Individuals with Hearing and Speech Disabilities*, Order, CC Docket 98-67, DA 04-465, 19 FCC Rcd 2993 at ¶ 5 (Feb. 24, 2004) (*Three-Way Calling Waiver Order*).

[4] *See Telecommunications Relay Services and Speech-to-Speech Services for Individuals with Hearing and Speech Disabilities*, Second Report and Order, Order on Reconsideration, and Notice of Proposed Rulemaking, CC Docket No. 98-67, CG Docket No. 03-123, FCC 03-112, 18 FCC Rcd 12379 at ¶¶ 72-75 (June 17, 2003) (*Second Improved TRS Order & NPRM*).  We note that this requirement has been waived for IP Relay and VRS until January 1, 2008. *Id.* at ¶ 76.

[5] *Id.* at ¶ 72.

parties, or, second, one of the parties to the call may set up the call.[6]  In the August 1, 2003, *Captioned Telephone Order,* we recognized captioned telephone service as a type of TRS.[7]  That order did not waive the requirement that providers of captioned telephone service offer three-way calling.

3.      On September 24, 2003, AT&T Corp. (AT&T) filed a petition seeking waiver of the deadline for providing three-way calling, asserting it was not possible for the TRS facility to set up a three-way call, subject to clarification regarding how three-way calling may be provided in compliance with the Commission's regulations.[8]  On December 11, 2003, Ultratec, Inc. (Ultratec) and Sprint Corporation (Sprint) filed a joint petition[9] seeking clarification that the three-way calling requirement either does not apply to captioned telephone service, such as CapTel,[10] or, in the alternative, that a TRS provider complies with this rule regardless of the actual method used to set up these calls.

4.      On February 24, 2004, in response to these petitions, the Consumer & Governmental Affairs Bureau (Bureau) released an order waiving the requirement that TRS providers offer three-way calling functionality for one year, *i.e.*, until February 24, 2005.[11]  The Bureau noted that it was not technologically possible for a TRS facility to set up a three-way call.[12]

5.      On November 30, 2004, in anticipation of the February 24, 2005 expiration date of the three-way calling waiver as set forth in the *Three-Way Calling Waiver Order,* the Commission released a Public Notice seeking comment on whether TRS providers would be able to offer three-way calling as of the waiver expiration date, or whether it is necessary to extend the waiver.[13]  The Commission also sought comment on whether, instead of a waiver, the requirement might be modified or clarified and, if so, how.[14]

6.      In response to the November 30, 2004, Public Notice, four comments and two reply comments were filed.[15]  All commenters generally agree that it is still not technologically possible for a

---

[6] *Id.* at ¶ 73.

[7] *See Telecommunications Relay Services and Speech-to-Speech Services for Individuals with Hearing and Speech Disabilities,* Declaratory Ruling, CC Docket No. 98-67, FCC 03-190, 18 FCC Rcd 16121 (August 1, 2003) (*Captioned Telephone Order*). Captioned telephone service is an enhanced Voice Carry Over (VCO) service that allows a user, on one standard telephone line, to both listen to what the other party is saying and simultaneously read captions of what the other party is saying. This way, a typical user of this service, who has the ability to speak and some residual hearing, can both listen to what is said over the telephone and read captions for clarification. A CA using specially developed voice recognition technology generates the captions

[8] *AT&T Petition for Limited Reconsideration and for Waiver* at 7-10 (filed Sept. 24, 2003) (*AT&T Waiver Request*). The *AT&T Waiver Request* was placed on Public Notice and comments and reply comments were received in response. All of the commenters stated that they interpreted the three-way calling requirement to be fully satisfied if a TRS facility processes such a call initiated by an end user using a LEC's customer calling service (CCS) feature. *See Three-Way Calling Waiver Order* at ¶ 4 & n.9.

[9] *Petition for Clarification by Ultratec, Inc. and Sprint Corporation* (filed Dec. 11, 2003) (*Joint Petition*).

[10] CapTel is a proprietary technology of Ultratec. *See Captioned Telephone Order* at ¶ 4 n.11.

[11] *See Three-Way Calling Waiver Order* at ¶ 5.

[12] *Id.*

[13] *Federal Communications Commission Seeks Comment on Expiration of Waiver of Three-Way Calling Requirement for Providers of Telecommunications Relay Services (TRS),* Public Notice, CC Docket No. 98-67, CG Docket No. 03-123, DA 04-3709 (Nov. 30, 2004).

[14] *Id.*

[15] Comments were filed by AT&T (Dec. 17, 2004); MCI (Dec. 17, 2004); SBC Communications, Inc. (SBC) (Dec. 17, 2004); and Ultratec, Sprint, & Hamilton Relay, Inc. (Hamilton) (as Joint Commenters) (Dec. 17, 2004). Reply

(continued....)

TRS facility to originate or set up a three-way call.[16]  All parties also generally agree that the three-way calling requirement should be deemed satisfied if the provider handles or facilitates a three-way call when arranged by one of the parties to the call.[17]  AT&T states, for example, that it "processes three-way TRS calls established by the end user through LEC-provided CCS [custom calling features] or through bridging via the user's own premises equipment," and that "the most reasonable interpretation of the *Second Improved TRS Order* is that the Commission requirement is fully satisfied if a TRS center processes such three-way calling initiated in that manner."[18]

7.    Ultratec, Sprint, and Hamilton assert that a captioned telephone provider or CA is not capable of initiating or setting up a three-way call.[19]  They further note that the "CapTel technology does not permit CapTel users to set up three-way calling from their captioned telephone devices."[20]  They assert that the three-way calling requirement should be interpreted to mean that the provider must be capable of handling a three-way call if *any* of the parties to the call sets up the call; *i.e.,* that the three-way calling requirement is met if the "parties to a relay call are able to *participate* in a [three-way call], even if the TRS providers handling these calls are not able to set up these calls themselves."[21]  They add that "CapTel services, as well as other TRS services provided by Hamilton and Sprint, are already in compliance with this interpretation of the ... three-way calling standard."[22]

## II.    DISCUSSION

8.    Based upon our review of the prior orders addressing this issue, and the comments, we clarify that TRS providers (including providers of captioned telephone service) will satisfy the three-way calling requirement set forth in the *Second Improved TRS Order & NPRM* if they ensure that the TRS facility or CA facilitates or handles a three-way call, as the CA would handle any TRS call, where and to the extent the three-way call has been arranged by any one of the parties to the call, *e.g.,* using a party's LEC-provided custom calling service (CCS), by bridging two telephone lines via customer terminal equipment, or by some other means.  Therefore, we clarify that TRS providers are not required to be able to arrange, initiate, or set up a three-way call (but they may do so).  In addition, because providers may meet the three-way calling requirement in various ways, we will not further specify any particular method(s) of handling such calls, so long as the provider is able to handle or facilitate a three-way call, in some manner, whether initiated by one of the parties to the call *or* set up by the provider.[23]  We believe

(...continued from previous page)
Comments were filed by Hamilton (Dec. 30, 2004) and by Telecommunications for the Deaf, Inc. (TDI) & National Association of the Deaf (NAD) (as Joint Commenters) (Dec. 30, 2004).

[16] *See* AT&T Comments at 3-4; SBC Comments at 2; Ultratec, Sprint, & Hamilton Joint Comments at 3-6; Hamilton Reply Comments at 2; and TDI & NAD Joint Reply Comments at 2.  MCI, however, suggests that it can establish a three-way call, and that the waiver for three-way calling should be allowed to expire.  MCI Comments at 2.

[17] *See, e.g.,* AT&T Comments at 3; Ultratec, Sprint, & Hamilton Joint Comments at 4-6.

[18] AT&T Comments at 3.

[19] *See* Ultratec, Sprint, & Hamilton Joint Comments at 3-4.

[20] *See Id.*

[21] *See Id.* at 2 (emphasis in original).

[22] *Id; see also* TDI & NAD Joint Reply Comments at 2 (agreeing with Ultratec, Sprint and Hamilton's view that the three-way calling obligation is met when parties to a relay call are able to participate in a three-way call, even if the TRS provider is not able to set up the call).

[23] We therefore agree with Sprint that there is no requirement that a captioned telephone provider be able to set up a three-way call, or that the captioned telephone user be able to initiate a three-way call, so long as the captioned telephone provider provides for three-way calling in some manner.  *See* Ultratec, Sprint, & Hamilton Joint Comments at 3-6.

that permitting flexibility in the manner in which a provider handles or facilitates three-way calling is consistent with the ultimate objective of ensuring that TRS users have access to this feature.[24]

9.      Because we have clarified that a TRS provider meets the three-way calling requirement set forth in the *Second Improved TRS Order & NPRM* by handling such calls when initiated or set up by one of the parties to the call (*or* by the provider setting up the call), the record reflects that waiver of this requirement is no longer necessary. Accordingly, the one-year waiver of this requirement set forth in the *Three-Way Calling Waiver Order* will expire, pursuant to that order, on February 24, 2005.[25]

10.     *Paperwork Reduction Act.* This document does not contain new or modified information collection requirements subject to the Paperwork Reduction Act of 1995 (PRA), Public Law 104-13. In addition, it does not contain any new or modified "information collection burden for small business concerns with fewer than 25 employees," pursuant to the Small Business Paperwork Relief Act of 2002, Public Law 107-198.[26]

11.     *Congressional Review Act.* The Commission will not send a copy of this *Order* pursuant to the Congressional Review Act[27] because the *Order* neither adopts nor modifies a rule, but clarifies an existing rule.

## III.   ORDERING CLAUSES

12.     Accordingly, IT IS ORDERED that pursuant to the authority contained in Sections 0.141, 0.361, and 1.3 of the Commission Rules, 47 C.F.R. §§ 0.141, 0.361, and 1.3, this *Order* IS ADOPTED.

13.     IT IS FURTHER ORDERED that the three-way calling requirement set forth in 47 C.F.R. § 64.604(a)(3)(vi) is clarified as indicated herein.

14.     To request materials in accessible formats (such as Braille, large print, electronic files, or audio format), send an e-mail to fcc504@fcc.gov or call the Consumer & Governmental Affairs Bureau at

---

[24] AT&T requests that we clarify the "appropriate basis for billing end users that are parties to the conference call." AT&T Comments at 4 n.10. In the *Second Improved TRS Order & NPRM* we addressed how the costs of three-way TRS calls may be recovered from the Interstate TRS Fund. *Second Improved TRS Order & NPRM* at ¶¶ 74-75. To the extent AT&T seeks guidance on how a provider may recover the costs of providing three-way calling service generally (*i.e.,* not the costs of providing the relay service), we note only that a provider may not impose charges on a TRS user that are different than those that would be charged to a hearing person using voice telephone service and the three-way calling feature.

[25] The expiration of this waiver will not affect the current three-way calling waiver for IP Relay and VRS. *See Second Improved TRS Order & NPRM* at ¶ 76.

[26] *See* 44 U.S.C. § 3506(c)(4).

[27] *See* 5 U.S.C. § 801(a)(1)(A).

(202) 418-0530 (voice) or (202) 418-0432 (TTY).  This *Order* can also be downloaded in Word and Portable Document Formats (PDF) at http://www.fcc.gov/cgb.dro.

FEDERAL COMMUNICATIONS COMMISSION


K. Dane Snowden, Chief
Consumer & Governmental Affairs Bureau

TAB F

**Products Developed by Dr. Raanan Liebermann**

1. The Signtel Phone: Deaf to deaf Telephone

Most deaf individuals communicate in sign language. In order to communicate with
another deaf person at a distance, such deaf persons must communicate by telephone. The
deaf to deaf telephone enables two deaf individuals to communicate by phone without the
need for the Internet, or installing broadband or DSL. The telephone is operated on
standard telephone lines. The apparatus in front of each of the parties contains the device
(composed of video camera, processing unit, and screen) and a telephone. When a
connection is established, the caller communicates in sign language, and each party can
see the other person signing on his or her screen in real time.

*Status: Product is complete*
*Legal Status: Patent Pending*


2. Stethoscope for Hard of Hearing Physicians

Many people, including physicians, experience hearing loss as they age, but admitting
this disability to others is frequently difficult or embarrassing. The Amplifying
Stethoscope is a small round unit about the size of a U.S. Quarter and about half an inch
high, which can unobtrusively be attached to a standard stethoscope, and which amplifies
the sound of a patient's heartbeat. This device will assist a hard-of-hearing physician,
without calling attention to his or her hearing loss.

*Status: Product is complete*
*Legal Status: No patent applied for*


3. Telephone for the deaf (Between hearing and deaf)

The telephone for the deaf enables one-to-one real-time communications between hearing
and deaf individuals without the need for a TTY machine. The telephone comprises two
legs. One leg is from the hearing to the deaf, in which spoke English is translated into
sign language that the deaf person can see on the screen. The second leg entails artificial
intelligence that recognizes the deaf person's sign language and converts it to synthetic
speech for the hearing party.

*Status:  The deaf to hearing leg is in prototype status; the hearing to deaf leg is complete*
*and past the beta stage.*
*Legal Status: Patent No. 5.982.853; issued in 1999.*


4. The Electronic Book (eBook)

Most deaf individuals are poor readers, because their native language is sign language (visually based) not English (phonetically based). Reading books is therefore often a difficult task for the deaf. The electronic book (eBook) automatically translates text into sign language that deaf readers can see on a screen.

*Status: Alpha state complete*
*Legal Status: Covered under patent pending*

5. Publix E-mail Service Technology

Publix e-mail service is based on the addressee phone number, enabling e-mail delivery to parties who are not subscribers to any ISP, and even to parties who have no computer system. If a message is sent to a person with no email address in database, the publix.net system dials the person's phone number and delivers the message by voice. The addressee can respond in voice, which will either be translated into text and sent to the originator, or delivered in voice when appropriate. This service enables senders to reach an addressee despite changes of e-mail address.

*Status: Design completed; product ready for Alpha*
*Legal Status: Patent pending*

6. TTY E-mail (eTTY)

TTY users who do not own a computer, or cannot afford to subscribe to an Internet Service Provider, need an email substitute. TTY e-mail (eTTY) provides speech and hearing disabled persons with email addresses (as part of the Publix email system), allowing them to send and receive email without the need for any additional equipment.

*Status: Ready for Beta*
*Legal Status: Patent pending*

7. Payphone Assisted Messaging (PAM)

Speech and hearing disabled persons are often unable to afford cell phones, and are unable to use public payphones. The PAM is a small and inexpensive device that fits over the mouth- or earpiece of a payphone and has a small screen. The PAM user utilizes the payphone keys to communicate with another party by sending and receiving canned messages through the TRS center, and can be used whether or not the other party is hearing or speech disabled.

*Status: Design completed; ready for Alpha*
*Legal Status: Patent Pending*

8.  Emergency Vehicle Alert (EVA)

The EVA assists deaf drivers at street corners, railway crossings, or other situations in
which they may be unable for some reason (e.g., a sharp angle in the road) to see an
approaching ambulance, fire engine, police car, train, or other vehicle.  The device is
mounted on the dashboard of the car, and emits a light strobe to alert the deaf driver. The
EVA also contains a portable unit that can be used by deaf pedestrians in similar
situations.

*Status: Design completed; ready for Alpha*
*Legal Status: Patent Pending*


9.  Enlarge (NLarge)

People with poor eyesight often have difficulty reading the narrow URL address window
in an internet web browser.  NLarge enables these computer users to right-click on the
URL address window and get an enlarged window with large fonts; they can type as
needed in the enlarged window, then left-click to paste the URL address in the browser's
URL address window.

*Status: Product is complete and ready for a Beta.*
*Legal Status: Patent Pending*


10.  Signtel Interpreter VR

The Signtel Interpreter VR seamlessly translates text and spoken English into sign
language displayed on a computer screen. New voice recognition technology captures the
hearing party's voice and translates it into text, and the text is subject to lexical analysis
and translated into sign language. The Signtel Interpreter VR recognizes over 30,000
words and 1,400 idioms and phrases. The product has many customizable options and
features required by deaf users, including:

*   Correct translation of dates, time, money, names, and decimals, all of which are
    signed differently.
*   Correct finger-spelling of names (e.g., Mr. Brown rather than the color brown).
*   Forced finger-spelling option, allowing the user to change any signed word into
    finger spelling. This is often done in sign language, and is particularly useful for
    communication between persons from different regions of the US, whose sign
    language often manifests regional differences (analogous to spoken accents).
*   Correct signing of multiple meaning words such as "act," "right," or "cool." Such
    words have a different sign for each meaning (unlike written English, which uses the
    same spelling for all meanings). The Signtel Interpreter VR chooses the correct sign
    and integrates it seamlessly into the video translation.

3

- Drag and drop saving features, allowing the user to quickly and easily save a conversation and later drag it back for review in sign language.
- Pop-up video box feature allows quick translation from any text including e-mails or Internet pages.

*Status: Product is complete and has passed a lengthy and successful Beta;*
      *Product is sold on the market.*
*Legal Status: Patent pending*


11.  The Classroom Companion

Deaf students who wish to attend a class with hearing people face several challenges. They cannot hear the lecturer, cannot hear and respond to classmates sitting next to them, and are often unable to correctly interpret various environmental cues (e.g., whether everyone is standing up because class has ended early, or because the instructor has decided to move everyone to a different room, such as a laboratory). The Classroom Companion, which is based on Signtel Interpreter VR technology, enables a deaf student to do all that. Furthermore, the classroom companion can receive telephone calls, and translate the message into sign language, while the lecturer's speech is stored in a buffer and accumulated for later review.

*Status: Design completed, ready for alpha*
*Legal Status: Patent pending on the Signtel Interpreter segment*


12. Signing Clips

This product enables webmasters to acquire specified words or sentences for display in sign language on their web sites. The sentences are submitted in text to SignTel, and the signing clips are emailed back to the ordering party.

*Status: Product passed a lengthy and successful beta, and is available on the market*
*Legal Status: Covered under patent pending*


13.  Listening Selector

A hard of hearing person using a standard hearing aid often has difficulty filtering out ambient sounds or multiple conversations around a table or at a social event.  The Listening Selector enables users to focus exclusively on a single speaker and minimize other noises, thereby facilitating their communication in many situations.

*Status: Preliminary design completed*
*Legal Status: Patent pending*

14. Remote Fire Alarm with Direction

The device is a fire alarm for persons with hearing disabilities that notifies them about fires in relatively close proximity (but perhaps not within their field of vision), such as in the hallway of a hotel or motel, or on another floor of a building. It informs the hearing disabled person of the location of the fire and the direction in which it is moving.

*Status: Initial design completed*
*Legal Status: Patent pending*

15. Burglar Alarm

Many deaf people consider themselves especially vulnerable to crime, including break-ins by prowlers who can move about without being heard by a deaf person. This product informs deaf and hearing disabled persons if an unauthorized entry has occurred on the premises, such as in another room of an apartment or house. The device also indicates the specific location of the break-in.

*Status: Initial R&D completed*
*Legal Status: Patent pending*

16. Device for Summoning Help

This device enables a person with a hearing or speech disability to request assistance from inside his or her vehicle while being threatened by another driver or other person outside the vehicle.

*Status: Initial R&D Completed*
*Legal Status: Patent Pending*

17. TTY Conferencing Technology

TTY does not respond to a dual line connection and therefore cannot be used in a standard conference call. TTY conferencing technology enables any TTY user to participate in a conference call without replacing or enhancing the functionality of the basic TTY unit. A TRS calling assistant facilitates the conference call among 3 or 4 parties; each party can contribute to the conversation, and each party receives a transcription on his or her TTY machine of the comments by every other party.

*Status: Product completed successfully a beta, and is ready for marketing*
*Legal Status: Patent pending*

18. The Electronic Cane (eCane)

The eCane is a navigation and communication device designed to assist persons who are both deaf and blind (deafblind). It allows deafblind individuals to navigate through streets and buildings without the need for assistance. The eCane also acts as a communication device, enabling one-to-one communication between the deafblind and another party, whether or not the other party can hear or see, using vibrations (for incoming communication) and electronic signals (initiated by the deafblind for outgoing communication). The eCane provides the deafblind with specific information concerning his or her current location, as well as directions to another location.

*Status: Initial R&D completed*
*Legal status: Patent pending*

19. The Electronic TV (eTV)

The Electronic TV (eTV) enables the deafblind to "watch" television. Visual information is transmitted via electromechanical gloves that translate dynamic visual content into vibrations and impacts on the palm, fingers and back of the hands. At the present time, the deafblind can communicate only by finger-spelling in the cup of the hand or by reading Braille. Thus, they live in almost total isolation from sensory excitation and suffer severe deprivation of social contact. The eTV enables media access and more extensive contact with the outside world.

*Status: Design completed*
*Legal Status: Patent pending*

20. Touch Language

The linguistic basis of eTV and other devices for the deafblind, Touch Language enables transmission of information based on pragmatics, where the topics articulated on the palm (PalmScreen) are augmented by information concerning their nature and activity by utilization of body parts, such as fingers and hands that are subject to vibrations and impacts. Complete articulation results in a functionally equivalent sensory reception of visual scenes, and enables far quicker and more complete cross-cultural communication than finger-spelling or Braille.

*Status: Product completed; descriptive manuscript is available*
*Legal Status: Patent pending*

21. Sports & Game Devices for the Deafblind (SGD)

6

Currently, blind and deafblind persons are precluded from participation in games and sports. SGD enables deafblind persons to play games such as chess or cards, by attaching a small device to the gaming part, which transmits information about character and location of the item. The device can also be attached to moving objects, enabling deafblind participation in athletic activities outdoors or in a gymnasium.

*Status: Preliminary design completed*
*Legal Status: Patent pending*


22. Personal Locator

For deafblind persons who are institutionalized or otherwise unable to navigate with the eCane, the Personal Locator enables navigation to particular locations (e.g., a friend's room or nurse's station) or particular individuals, through communication between the Personal Locator and companion devices placed strategically in certain locations or worn by certain persons. The Personal Locator also enables location of individuals with dementia who may become confused and lost.

*Status: Preliminary design completed*
*Legal Status: Patent pending*


23. Automated Telecommuting CAs At Large (ATC)

There are areas in the U.S. where there are shortages of suitable potential employees who are willing and able to serve as TRS Communication Assistants (CAs), and there are other areas in which there is a surplus of qualified candidates. Furthermore, there is a pool of potential CAs that has not yet been tapped into, and which could serve a significant social and economic function: the blind. Using a Braille computer instead of the regular CA's console, the ATC is designed to enable such persons serve as CAs, and to do so from any location in the U.S. The ATC forwards overflow calls to targeted CAs at-large, thereby providing employment for the blind and increasing the efficiency of the TRS system as a whole.

*Status: Initial design completed*
*Legal Status: Patent pending*


24. Telephone Comprehension Facilitator (TCF)

Hard of hearing individuals, and people who have suffered hearing loss due to aging, frequently have difficulties understanding speech over the telephone, especially rapid speech. The TCF device takes telephonic speech, places it in a buffer, and slows down the stream of speech, adhering to the FIFO system. Slowing down the speed of speech is

useful not only to the hard of hearing, but also to aging persons who may find the normal speed of speech too fast for easy comprehension.

*Status: Initial design completed*
*Legal status: Patent pending*


25.  Fast Cash Transactions (FCT)

FCT is a monetary system designed to act as an intermediary layer between the Federal Reserve and the banking system. It enables the user to create a disposable checking account, where the user sets an account and completes the transaction, which is followed by the automatic closing down of the transactional checking account. It enables the user to deposit or obtain cash at any point of sale (e.g., supermarket, gas station, ATM), where the money is either held in an FCT online account or deposited by anyone who can do so on the phone. It enables secure transfer of money, including Internet transactions, without exposing users to fraudulent activities.

*Status: Ready for customized deployment*
*Legal Status: Patent pending*


\16688\1\496291.2

8