UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CASE NUMBER: 3:02CR55 (EBB) |
| | : | |
| v. | : | March 8, 2005 |
| | : | |
| RANAAN LIEBERMANN and | : | |
| PUBLIX NETWORK CORPORATION | : | |

**GOVERNMENT'S RESPONSE TO RANAAN LIEBERMANN'S
MEMORANDUM IN AID OF SENTENCING**

**Introduction**

Defendants Ranaan Liebermann ("Liebermann") and Publix Network Corporation

("Publix") previously pleaded guilty to a two-count Substitute Information charging both

defendants with false statements, in violation of 18 U.S.C. § 1001 and money laundering, in

violation of 18 U.S.C. § 1957. The Presentence Report ("PSR") recommends that the Court

calculate defendant Liebermann's total offense level (before taking into account any departures)

to be level 17, yielding a Guidelines Sentencing Range of 24-30 months of imprisonment, a fine

range of $5,000 to $50,000, a period of supervised release of up to three years, and $200 in

mandatory special assessments.[1]  The PSR for defendant Publix recommends a fine range of $2,000,000 to $4,000,000.  Sentencing is scheduled to occur on March 9, 2005.

Liebermann has submitted a memorandum, dated February 28, 2005, in support of a sentence that does not include a period of incarceration.  See Defendant's Memorandum in Aid of Sentencing (hereinafter, "Memorandum") at 1.  Framing his argument for leniency in terms of downward departures recognized by the United States Sentencing Guidelines, Liebermann asserts that several departures are applicable to his case: (1) his employment-related contributions (U.S.S.G. § 5H1.11); (2) the purported lack of financial motive for the offense (U.S.S.G. § 5K2.0); (3) the stipulated loss amount of $2,000,000 supposedly overstates the seriousness of the offense (U.S.S.G. § 2F1.1[2]); (4) aberrant behavior (U.S.S.G. § 5K2.20); and (5) a combination of characteristics and circumstances places Liebermann's case outside the "heartland" of cases covered by the Guidelines (U.S.S.G. § 5K2.0).  In addition, Liebermann points to several other factors as potentially relevant to the Court's sentencing determination,

---

[1]    The Government objects to the Liebermann PSR to the extent it fails to include a four-level adjustment for Liebermann's leadership role in the offense under U.S.S.G. § 3B1.1.  As Liebermann himself acknowledges, see Memorandum at 17-19, the employees of Publix's sister companies engaged in "dotting" at Liebermann's direction.  Liebermann attempts to portray "improper" dotting as the product of "goofing off" by some of his employees, and claims that he "took active steps to change employee behavior."  Id. at 18.  This assertion is in serious tension with the factual stipulation signed by the parties, in which Liebermann acknowledged that he was "fully aware of the practice of 'dotting' and that employees who were 'dotting' were not engaged in any active communication over their TTY devices."  Stipulation of Offense Conduct ¶ 15.  Liebermann also admitted in that stipulation that he "failed to stop the practice of 'dotting' and, on occasion, instructed and encouraged those employees to use 'dotting' to maintain their connections on calls."  Id.  It is undisputed that more than five Liebermann employs engaged in improper dotting and that they engaged in dotting at Liebermann's direction.  In these circumstances, a four-level adjustment for aggravating role is appropriate.  U.S.S.G. § 3B1.1(a).

[2]    The parties have stipulated that the November 1, 2000 Guidelines Manual applies to this case.

including his detention for three days following his arrest; his apparently excellent compliance

with the conditions of pretrial release; and the fact that he traveled to and from Israel on two

occasions and turned over to the Clerk a new Israeli passport that he obtained while in Israel on

one of those trips.  Given the substantial harm caused by Liebermann's actions and the need to

deter schemes of this nature in the future, the Government respectfully submits that none of the

factors cited by Liebermann individually or collectively warrant a downward departure.  The

Government believes that the Court should sentence Liebermann within the applicable

Guidelines range.

**<u>Discussion</u>**

**A.**      **Employment-related Contributions**

As Liebermann concedes, employment-related contributions "are not ordinarily relevant"

in determining a downward departure.  <u>United States v. Rioux</u>, 97 F.3d 648, 663 (2d Cir. 1996);

U.S.S.G. §§ 5H1.5, 5H1.11 (2000); Memorandum at 22.  He argues, however, that his "history of

achievement and dedication to assisting others," along with a sincere desire to "make a difference

in other people's lives" renders his situation the "exceptional" case in which a departure on this

basis is warranted.

The Government acknowledges the defendant's past work with law enforcement, and the

fact that the defendant directed his talents to assisting the hearing-impaired.  Liebermann's

argument would be stronger, however, had his efforts to develop new technology for the deaf not

been financed in recent years by the ill-gotten gains of his criminal conduct directed toward a

fund that provides services to the same individuals Liebermann sought to assist.  <u>See</u> <u>United</u>

<u>States v. Wright</u>, 363 F.3d 237, 249-50 (3d Cir. 2004) (affirming denial of departure sought by

3

church pastor who stole from church).  Moreover, the information proffered in support of a

departure on this basis does not rise to the level of "exceptional" dedication or personal sacrifice.

See United States v. Korman, 343 F.3d 628 (2d Cir. 2003) (providing grand jury testimony,

without further evidence, does not constitute extraordinary service); United States v. Acosta, 846

F.Supp. 278, 279-80 (S.D.N.Y. 1994) (defendant's heroic act of saving another's life while

risking his own, coupled with defendant's mental retardation, justified downward departure).

While it is a close call, in this case, Liebermann's contributions, while commendable, do not rise

to the level of an "extraordinary" situation meriting a departure from the sentencing range.  See

United States v. Gaines, 295 F.3d 293 (2d Cir. 2002) (district court did not err in finding that

defendant's prior assistance in state murder prosecution, while commendable, was not so

extraordinary to justify a departure); United States v. McClatchey, 316 F.3d 1122, 1135 (10th

Cir. 2003) (noting it is usual and ordinary in white collar prosecutions to find a defendant

involved as a leader in community charities, civil organizations, and church efforts).

**B.    Financial Motive for the Offense**

        Liebermann next argues that he is entitled to a downward departure based on his initial

lack of intent to defraud the government.  Memorandum at 23-24.  He argues that he did not set

out to defraud the government, and that his company grew "organically . . . because Dr.

Liebermann sought additional data through Deaf focus groups . . . ."  Id.  He asserts that he is

therefore entitled to a downward departure under § 5K2.0.

        While engaging in his admitted criminal conduct, Liebermann was no doubt partly

motivated by a desire for scientific achievement, either for reasons of professional recognition, or

at best, altruistic considerations.  The structure of Liebermann's scheme and the remuneration he

personally derived from it, however, make plain that personal financial considerations were also a motivating factor.

First, if Liebermann had wanted merely to collect data from deaf focus groups, even if the data collectors and the members of the focus groups were to be his own employees, he surely could have done so by either 1) using established TRS service providers or 2) using face-to-face data collection procedures. Even allowing for the technical limitations and unwillingness of other TRS providers as stated in the defendant's Memorandum, the main benefit of Liebermann's formation of his own TRS center is that by using that method, Liebermann was able to generate a stream of income that greatly exceeded the overhead costs of setting up the scheme. These profits could then be used either to fund additional research and promotion of the Signtel device (thereby generating a reliable, steady source of underwriting, a main concern to any scientific researcher) or to provide Liebermann with personal income while he worked on his inventions. In fact, the income derived from the scheme went to both of these purposes, and Liebermann plainly benefitted from each purpose.

For instance, Liebermann personally derived income from this scheme. In 1999, Publix declared gross receipts of approximately $1 million. Publix's two main business deductions from these gross receipts were $100,000 in salary to Liebermann, and $572,700 in royalty payments to Revenue Controls Corporation, a subchapter S corporation wholly owned by Liebermann. Revenue Controls in turn provided Liebermann with a salary of $120,000 and in excess of $85,000 in pass-thorough income. Thus, in 1999, Liebermann grossed and declared about $305,000 in income from the two companies.

In 2000, however, Liebermann's and Publix's operations greatly expanded. In preliminary tax documents,[3] Publix declared gross receipts of $4.9 million, $2.2 million of which went to royalty payments to Signtel, and $829,129 in royalties to Revenue Controls Corporation. Liebermann's personal preliminary tax returns showed income in excess of $3 million, $2.6 million of which was income from sources including, inter alia, royalties, partnerships, and S corporations.

Given these figures, the Government disputes the defendant's notion that this explosive growth was "organic," as if it could not be controlled, and was not the end result of several deliberate business and management decisions to expand the operation, and thereby expand business income. Regardless of whether a significant portion of these receipts was in fact plowed back into Liebermann's business, and not used to finance an extravagant lifestyle, the generation of such sums and the manner in which they flowed through Liebermann's corporations do not occur without forethought, and the personal use or reinvestment for business purposes benefitted Liebermann personally or his scientific research.

## C.    Whether the Loss Amount Overstates the Seriousness of the Offense

Liebermann next argues that a downward departure is in order because the amount of the loss overstates the seriousness of the offense. Memorandum at 24; U.S.S.G. § 2F1.1, Application Note 11 (2000). This argument is unavailing.

---

[3]    These figures are from estimated tax returns, which are not final. Therefore, there may be several adjustments that alter the final numbers for tax purposes. Because these figures are preliminary, the Government provides this information within this memorandum solely for illustrative purposes in order to rebut the specific assertions in the defendant's Memorandum, and not for definitive calculation of loss or income. Nothing in this memorandum should be construed as any assertion or determination on behalf of or by the Internal Revenue Service.

The Government acknowledges that the $2 million loss figure is, as the defendant states, an estimate of the amount of "dotting," but contrary to Liebermann's assertions in his Memorandum, the Stipulation of Offense Conduct provides that the loss figure is composed entirely of "claims for minutes that the defendants knew did not involve any active communications."  Stipulation of Offense Conduct ¶ 16; see footnote 1, supra.  The Stipulation of Offense Conduct further states that the loss figure, while approximate, is based on the Minutes Of Use (MOUs) that "were artificially generated."  Stipulation of Offense Conduct, ¶ 18. Because "loss need not be determined with precision" and the court "need only make a reasonable estimate of the loss" given the available information, including scope and duration of the offense, the stipulated $2 million loss figure is not subject to further downward calculation for purposes of determining the appropriate guideline range.  See U.S.S.G. § 2B1.1 (application note 3); § 2F1.1, (application note 8) (referring to 2B1.1 for valuation of loss).  Moreover, the Commentary's discussion of the possibility of a downward departure on the basis that the loss overstates the seriousness of the offense "has nothing to do with the calculation of that loss." United States v. Mucciante, 21 F.3d 1228, 1237 (2d Cir. 1994).  The defendant's argument for departure on this basis is therefore contrary to the Stipulation of Offense Conduct and inconsistent with the appropriate rationale for a departure.

As a general matter, while the operation of the fraud loss table treats dollars lost from all crimes the same, even when the types of criminal conduct may vary widely from case to case, in this case, the facts militate in favor of holding both Liebermann and Publix directly responsible for the loss figures and the resulting calculation of their respective sentences under the Guidelines.  Liebermann was personally involved in and directed the criminal conduct, and he or

corporations under his exclusive control were the ultimate destination of the money generated by the conduct.  Cf. United States. v. Restrepo, 936 F.2d 661, 667-68 (2d Cir. 1991) (defendants' conduct not connected to quantity of money involved in entire scheme).  The money generated was used by Liebermann to suit his purposes, personal or professional, and to continue, maintain, or expand the operations.  Cf. United States v. Broderson, 67 F.3d 452, 457-58 (2d Cir. 1995) (affirming downward departure as outside the heartland where defendant benefitted only his employer, and had received no personal benefit from the fraud; government received favorable contract, despite the fraud; and government received restitution from defendant's employer).  Liebermann's scheme involved more than minimal planning, and the construction of a business model based in part upon claims submitted for minutes that did not involve active communication or meaningful conversation.  Stipulation of Offense Conduct ¶¶ 16-18.  Because all of the claims for payment included in the $2 million loss were under Liebermann's control, this is not an instance where some portion of the loss "is a consequence of factors extraneous to the defendant's criminal conduct."  See United States v. Maldonado-Montalvo, 356 F.3d 65, 69 (1st Cir. 2003) (citations omitted) (discussing potential grounds for departure for overstatement of loss).

        For these reasons, this is not an instance in which the loss determined "may overstate the seriousness of the offense."  The example of such a case provided by the Commentary to § 2F1.1 is "where a defendant attempted to negotiate an instrument that was so obviously fraudulent that no one would seriously consider honoring it."  U.S.S.G. § 2F1.1, application note 11.  In contrast, with negligible exceptions, Publix's claims for payment were based solely upon conversations in which employees of one of Liebermann's entities were speaking (or dotting) to other employees

8

of Liebermann, a fact not evident on the face of Publix's claims for payment.  See Stipulation of

Offense Conduct, ¶¶ 12, 16.

Finally, the scope of the defendants' operations is revealed by placing them in context.

By January 2001, Publix had surpassed MCI to become the third-largest TRS provider in the

country, behind only AT&T and Sprint.  The relative size of Publix's operation compared to

telecommunications giants reinforces that the $2 million loss figure is an accurate reflection of

the gravity of the defendants' conduct.  As a result, the loss calculation and the corresponding

Guidelines impact is appropriate, and Liebermann is not entitled to a downward departure on the

ground that the loss amount overstates the seriousness of the offense.

## D.  Aberrant Behavior

Under the version of U.S.S.G. § 5K2.20 that was in effect at the time of this offense, "[a]

sentence below the applicable guideline range may be warranted in an extraordinary case if the

defendant's criminal conduct constituted aberrant behavior."  The commentary to this guideline

defined "aberrant behavior" as "a single criminal occurrence or single criminal transaction that

(A) was committed without significant planning; (B) was of limited duration; and (C) represents

a marked deviation by the defendant from an otherwise law-abiding life."  U.S.S.G. § 5K2.20,

application note 1.[4]  "For offense conduct to be considered for departure as aberrant behavior, the

---

[4]      Liebermann relies on Zecevic v. U.S. Parole Commission, 163 F.3d 731 (2d Cir. 1998),
which enumerated several factors that sentencing courts could consider in determining whether a
defendant's conduct was aberrant and applied a totality of the circumstances test.  See
Memorandum at 25.  The November 2000 amendments to U.S.S.G. § 5K2.20 specifically
rejected Zecevic's totality of the circumstances test.  See U.S.S.G. § 5K2.20, 2000 historical
notes.  The Second Circuit subsequently recognized that to the extent Zecevic was inconsistent
with the November 2000 amendments to the Sentencing Guidelines, Zecevic was superseded by
those amendments.  See United States v. Gonzalez, 281 F.3d 38, 44-45 (2d Cir. 2002).

9

offense conduct must, at a minimum, have these characteristics."  U.S.S.G. § 5K2.20, historical notes.

The Government is prepared to concede that Liebermann's participation in the scheme that led to this prosecution represents a "marked deviation" from an otherwise law-abiding life. The Government takes issue with Liebermann's claim that this offense was committed without "significant planning."  See Memorandum at 26; Stipulation of Offense Conduct ¶ 18 ("the parties stipulate and agree that the defendants' criminal conduct involved more than minimal planning within the meaning of U.S.S.G. § 2F1.1").  However, for purposes of deciding whether a departure for aberrant behavior is warranted, the Court need not determine whether the offense involved significant planning, because it is indisputable that the offense was not of "limited duration."  According to the Stipulation of Offense Conduct, Liebermann submitted Publix's monthly requests for reimbursement to NECA with claims for time spent on improper dotting between approximately January 1999 and March 2001.  Stipulation of Offense Conduct ¶ 16. Because this offense was not of limited duration, Liebermann is not entitled to a departure based on aberrant behavior.  See United States v. Colace, 126 F.3d 1229, 1231 (9th Cir.1997) (stating that offense was not of limited duration where defendant had two months to reflect on his criminal conduct); United States v. Dickerson, 381 F.3d 251, 266-67 (3d Cir. 2004) (holding that a period of several weeks from preliminary discussion concerning drug courier trip through completion of offense "exceeds what we would view as a limited duration in this context. A few weeks is sufficient to give a defendant time to consciously reflect on her actions and consider whether she should engage in the relevant criminal behavior.").

10

**E.    Heartland Argument**

In extraordinary cases, a district court may depart where a number of factors, considered collectively, create a situation that differs significantly from the "heartland" cases covered by the guidelines. United States v. Rioux, 97 F.3d 648, 663 (2d Cir. 1996); see also United States v. Leung, 360 F.3d 62, 72 (2d Cir. 2004) ("Where an unusual constellation of factors exists that removes any sentencing from the 'heartland' cases, district courts are obligated to consider departures even though no one factor, standing alone, might justify an upward or downward departure.").

Liebermann claims that "[t]his is not a typical case, not a typical defendant." Memorandum at 27. To some extent, there is no "typical" criminal case and no "typical" defendant. All defendants are unique. This defendant certainly has his own unique attributes, but they cut both ways. For example, it is probably true that few federal criminal defendants have advanced degrees in astrophysics. There is no doubt that Liebermann is an exceptionally gifted and bright man. One wonders, then, why Liebermann should be treated more leniently than other fraudsters who lack his intellectual abilities and accomplishments.

In the 1970's and 1980's, Liebermann provided valuable services to the New Haven Police Department. However, it is disturbing to see someone who served the interests of law enforcement earlier in his life now try to use that service to shield himself from the consequences of his criminal acts. One wonders just how committed Liebermann could ever have been to the goals of law enforcement. It seems that when Liebermann's own goals and those of the law coincide, he is happy to abide by the law. On the other hand, Liebermann demonstrated in this case that if he feels his ends justify illegal means, he is willing to break the law.

11

In the Government's view, a heartland departure below the applicable Guidelines range would not serve the interests of specific and general deterrence. Liebermann appears to have tunnel vision when it comes to pursuing his scientific projects. The Government fears that a departure of the sort requested by Liebermann would send him the wrong signal: that society will merely slap him on the wrist if he cheats the Government out of millions of taxpayer dollars as long as he can show that he is truly committed to his projects. In the Government's view, Liebermann needs to approach his future projects with an expanded range of vision.[5] In addition, other individuals who may tempted to engage in large-scale fraud have to take from this case the knowledge that if they cheat the Government or anybody else out of $2,000,000, there will be extremely serious consequences, including the loss of their liberty for a period of time.

## F.    Other Factors Raised by Liebermann

Liebermann claims that his meticulous compliance with his conditions of pretrial release and his decision to turn over a new Israeli passport that he obtained on a trip to Israel are other factors that the Court should consider as warranting leniency. See Memorandum at 28.

---

[5]    Liebermann claims that the three days he spent in detention following his arrest constitute a sufficient deterrent. See Memorandum at 27-28. Perhaps the best way to respond to that assertion is to consider the following hypothetical. Liebermann is sentenced to probation in this case and continues his scientific projects. He needs $2,000,000 to refine a new technology that he is developing, so he solicits a venture capital firm for the necessary funds. The firm asks Liebermann to provide it with data demonstrating the viability of his technology. Liebermann does not have such data, but subjectively believes that, if he had the time to conduct necessary tests, he could generate the requested data. He weighs two options: (1) tell the firm that he has no data and probably be rejected for funding; or (2) create bogus data, provide it to the firm, and probably receive the $2,000,000 in funding. Liebermann then considers that the price for advancing his scientific goals is the possibility that he will have to spend three days in jail. Based on all that the Government and the Court has learned about Ranaan Liebermann, the Government submits that, in these circumstances, Liebermann probably would choose option number 2.

Liebermann's "minute-by-minute" logs of time spent outside the home seem only to confirm that

he has an obsessive sort of personality.  As for the new passport, Liebermann's conditions of

release presumably required him to turn over all passports and not to acquire any new passports.

Turning over the new passport is properly viewed not as an extraordinary act but rather as getting

Liebermann back into compliance with his conditions of release after straying into

noncompliance.  In any event, it would be setting the bar rather low for leniency if the Court

rewarded Liebermann merely for following its various orders relating to pretrial release.

<u>**Conclusion**</u>

For the foregoing reasons, the Government submits that the Court should deny

Liebermann's request for a downward departure and/or a non-Guidelines sentence of probation,

and sentence him within the applicable Guidelines range.

Respectfully submitted,

KEVIN J. O'CONNOR
UNITED STATES ATTORNEY


JONATHAN BIRAN
ASSISTANT U.S. ATTORNEY
Federal Bar No. ct21922



DAVID J. SHELDON
ASSISTANT U.S. ATTORNEY
Federal Bar No. ct07997
United States Attorney's Office
157 Church Street, 23rd Floor
New Haven, CT 06510
(202) 821-3700

13

CERTIFICATE OF SERVICE

This is to certify that on March 8, 2005, a copy of the foregoing was sent by facsimile

transmission and U.S. mail, postage prepaid, to the following:

E. Gates Garrity-Rokous, Esq.
Wiggin & Dana
One Century Tower
New Haven, CT 06508-1832

and to Carla Jo Wagenstein-Vega of the United States Probation office.


_____
JONATHAN BIRAN
ASSISTANT U.S. ATTORNEY